IN RE JUVENILE APPEAL (83-CD)* (9972)

SPEZIALE, C. J., PETERS, PARSKEY, SHEA and GRILLO, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 3161, the names of the parties involved in this appeal are not disclosed and the records and briefs will not be distributed to the various libraries of the state. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

Argued October 12, 1982—decision released February 15, 1983

*Bruce A. Morrison,* with whom were *Michael O. Sheehan* and, on the brief, *Sherry F. Bellamy,* for the appellant (mother of the minor children).

*Thomas DeMatteo,* assistant attorney general, with whom, on the brief, were *Carl R. Ajello,* attorney general, and *Judith M. Earl,* assistant attorney general, for the appellee (state).

*Shelley D. Geballe* and *Margaret Hayman* filed a brief on behalf of the Connecticut Civil Liberties Union as amicus curiae.

SPEZIALE, C. J. This is an appeal by the defendant, mother of five children, from the order of the Superior Court for juvenile matters granting tem-

porary custody of her children to the plaintiff commissioner of the department of children and youth services.

The defendant and her six children lived in a small apartment in New Haven. They had been receiving services from the department of children and youth services (hereinafter DCYS) as a protective service family[1] since 1976, and were supported by the Aid to Families with Dependent Children program.[2] Michelle Spicknall, a DCYS caseworker, was assigned to the defendant's case in January, 1979. In the next nine months she visited the defendant's home twenty-seven times. She considered the family situation "marginal," but noted that the children were "not abused [or] neglected." It was Spicknall's opinion that the children were very happy and active, and that they had a "very warm" relationship with their mother.

During the night of September 4-5, 1979, the defendant's youngest child, nine month old Christopher, died. The child was brought by ambulance to Yale-New Haven Medical Center where resuscitation was unsuccessfully attempted by his pediatrician, Robert Murphy. No cause of death could be determined at that time, but the pediatrician noticed some unexplained superficial marks on Christopher's body.

---

[1] A protective services family is one which has come to the attention of DCYS as having a potential for abuse, neglect, abandonment, or sexual exploitation. DCYS then investigates the family and, where appropriate, provides "support systems to bolster family functioning." DCYS: Programs and Priorities, FY 1979.

[2] Aid to Families with Dependent Children is a federal-state grant-in-aid program authorized by 42 U.S.C. §§ 601 et seq. and administered pursuant to General Statutes §§ 17-85 through 17-107.

Because of Christopher's unexplained death, the plaintiff commissioner of children and youth services seized custody of the defendant's five remaining children on September 5, 1979, under authority of the "96-hour hold" provision of General Statutes § 17-38a (e),[3] which permits summary seizure if the commissioner has probable cause to believe that a child is "suffering from serious physical illness or serious physical injury or is in immediate physical danger from his surroundings, and that immediate removal from such surroundings *is necessary to insure the child's safety . . . .*" (Emphasis added.)

[3] General Statutes § 17-38a (e) provides: "Agencies or institutions receiving reports of child abuse as provided in this section shall, within twenty-four hours, transfer such information to the commissioner of children and youth services or his agent, who shall cause the report to be investigated immediately. If the investigation produces evidence that the child has been abused in the manner described in subsection (b), he shall take such measures as he deems necessary to protect the child, and any other children similarly situated, including but not limited to the removal of the child or children from his home with the consent of his or their parents or guardian or by order of the superior court. If the commissioner of children and youth services or his designee, after such investigation, has probable cause to believe that the child is suffering from serious physical illness or serious physical injury or is in immediate physical danger from his surroundings, and that immediate removal from such surroundings is necessary to insure the child's safety, the commissioner, or his designee, may authorize any employee of his department or any law enforcement officer to remove the child from such surroundings without the consent of the child's parent or guardian. Such removal and temporary custody shall not exceed ninety-six hours during which time either a petition shall be filed with the superior court or the child shall be returned to his parent or guardian. If the commissioner determines that there are grounds to believe the child may be properly cared for in his own home, the parents or guardian, as the case may be, shall be aided to give such proper care under the supervision of the commissioner. Such supervised custody may be terminated when the commissioner finds a safe environment has been provided the child; but if the commissioner, after a reasonable time, finds this condition cannot be achieved in the child's own home under such supervision, he may petition the superior court for commitment of the child."

On September 7, 1979, in the Juvenile Court for New Haven, DCYS filed petitions of neglect under General Statutes § 46b-129 (a)[4] for each of the defendant's children. Accompanying each petition was an affidavit for orders of temporary custody asking that the court issue temporary ex parte orders to keep the five children in DCYS custody under authority of § 46b-129 (b) (2).[5] The petitions alleged, in addition to Christopher's unex-

---

[4] General Statutes § 46b-129 (a) provides: "Any selectman, town manager, or town, city, or borough welfare department, any probation officer, the Connecticut Humane Society, or the commissioner of human resources, the commissioner of children and youth services or any child-caring institution or agency approved by the commissioner of children and youth services, a child or his representative or attorney or a foster parent of a child, having information that a child or youth is neglected, uncared-for or dependent, may file with the superior court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent, within the meaning of section 46b-120, the name, date of birth, sex, and residence of the child or youth, the name and residence of his parents or guardian, and praying for appropriate action by the court in conformity with the provisions of this chapter. Upon the filing of such a petition, the court shall cause a summons to be issued requiring the parent or parents or the guardian of the child or youth to appear in court at the time and place named, which summons shall be served not less than fourteen days before the date of the hearing in the manner prescribed by section 51-309, and said court shall further give notice to the petitioner and to the commissioner of children and youth services of the time and place when the petition is to be heard not less than fourteen days next preceding the hearing in question."

[5] General Statutes § 46b-129 (b) provides: "If it appears from the allegations of the petition and other verified affirmations of fact accompanying the petition, or subsequent thereto, that there is reasonable cause to find that the child's or youth's condition or the circumstances surrounding his care require that his custody be immediately assumed to safeguard his welfare, the court shall either (1) issue an order to the parents or other person having responsibility for the care of the child or youth to show cause at such time as the court may designate why the court shall not vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing on the petition, or (2) vest in some suit-

plained death, that the defendant's apartment was dirty, that numerous roaches could be found there, that beer cans were to be found in the apartment, that the defendant had been observed drinking beer, that on one occasion the defendant may have been drunk, that a neighbor reported that the children once had been left alone all night,[6] and that the two older children had occasionally come to school without having eaten breakfast. On the basis of these allegations, on September 7, 1979, the court granted, ex parte, temporary custody to the commissioner pending a noticed hearing on temporary custody set for September 14, 1979, within ten days of the ex parte order as required by § 46b-129 (b) (2). The court also set October 1, 1979, for a hearing on the neglect petitions.[7]

At the September 14 temporary custody hearing, DCYS presented testimony of Spicknall confirming and elaborating on the conditions of the defendant's home and on the defendant's beer drinking. Christopher's pediatrician testified concerning

able agency or person the child's or youth's temporary care and custody pending a hearing upon the petition which shall be held within ten days from the issuance of such order on the need for such temporary care and custody. The service of such orders may be made by any officer authorized by law to serve process, or by any probation officer appointed in accordance with section 46b-123, investigator from the department of administrative services, state police officer or indifferent person. The expense for any temporary care and custody shall be paid.by the town in which such child or youth is at the time residing, and such town shall be reimbursed therefor by the town found liable for his support, except that where a state agency has filed a petition pursuant to the provisions of subsection (a) of this section, the agency shall pay such expense."

[6] The report was allegedly made by an upstairs neighbor of the defendant. At the hearing, the neighbor denied having made such a report at any time.

[7] The hearing on the neglect petitions was continued when additional evidence on the temporary custody petitions was heard on October 1, 1979. It was never rescheduled.

Christopher's treatment and physical appearance when the child was brought to the hospital on September 5. The doctor also testified that, although the pathologist's report on the autopsy was not complete,[8] the external marks on Christopher's body were not a cause of death, that no internal injuries were found, and that the child had had a viral lung infection. He also explained, on cross-examination, the term "sudden infant death syndrome" and its pathology. At the conclusion of the state's case, the court found "probable cause" and ordered temporary custody of the children to remain with the plaintiff commissioner of children and youth services.[9]

The defendant appealed to this court claiming that General Statutes § 46b-129 (b)[10] violates the due process clause of the fourteenth amendment both because it is an impermissible infringement on her right to family integrity, and because the statute is unconstitutionally vague. The defendant

---

[8] The final autopsy report was not complete at the time of the hearing. Preliminary findings were available, however, and the cause of death could not be determined. No evidence available at the hearing connected the death with any sort of neglect or abuse.

[9] The court stated after the state's first witness: "I think I have enough to make a determination. The court should have available to it that which is sufficient to make a probable cause determination for purposes of orders today."

Additional testimony was taken for purposes of the temporary custody order on October 5, 1979, and October 23, 1979, from witnesses called by the defendant, some of whom contradicted the facts alleged in the neglect petitions. The court then "affirmed" its earlier temporary custody order, and denied the defendant's motion to dismiss the petitions and the order of temporary custody.

[10] The defendant also attacks the definition of "neglect" in § 46b-120 as being unconstitutionally vague. This appeal, however, is from a temporary custody order issued pursuant to § 46b-129 (b); it is not an appeal of a neglect proceeding. We therefore do not address the "neglect" issue; § 46b-120; because it is not properly before us.

also claims error in the trial court's determination that "probable cause" is the standard of proof in a temporary custody proceeding. We conclude that § 46b-129 (b) is constitutional; however, we do find that the trial court erred when it decided that "probable cause" is the standard of proof in a temporary custody proceeding.

As hereinafter set forth, we hold: (1) that § 46b-129 (b) is constitutional because it must be read together with § 17-38a which contains adequate criteria for determining whether temporary custody of children may be taken from the parent by court order; and (2) that the standard of proof applicable to temporary custody proceedings pursuant to § 46b-129 (b) is a fair preponderance of the evidence.

I

CONSTITUTIONALITY OF GENERAL STATUTES
§ 46b-129 (b)

A

FAMILY INTEGRITY

The Connecticut legislature has declared: "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family." General Statutes § 17-38a (a).

In administering this policy, courts and state agencies must keep in mind the constitutional limitations imposed on a state which undertakes any form of coercive intervention in family affairs. The United States Supreme Court has frequently emphasized the constitutional importance of family integrity. "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights of man,' and '[r]ights far more precious . . . than property rights.' 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment." (Citations omitted.) *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). It must be stressed, however, that the right to family integrity is not a right of the parents alone, but "encompasses the reciprocal rights of both parents and children. It is the interest of the parent in the 'companionship, care, custody and management of his or her children,' *Stanley* v. *Illinois,* [supra], and of the children in not being dislocated from the 'emotional attachments that derive from the intimacy of daily association,' with the parent, [*Smith* v.] *Organization of Foster Families* [*for Equality and Reform,* 431 U.S. 816, 844, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977)]." *Duchesne* v. *Sugarman,* 566 F.2d 817, 825 (2d Cir. 1977). This right to family integrity includes "the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state." *Duchesne* v. *Sugarman,* supra.

## B

CRITERIA FOR COERCIVE INTERVENTION BY THE STATE

Where fundamental rights are concerned we have a two-part test: "[1] regulations limiting these rights may be justified only by a 'compelling state interest,' and . . . [2] legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." *Roe* v. *Wade,* 410 U.S. 113, 155, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). The state has a substantial interest in protecting minor children; *Stanley* v. *Illinois,* supra, 649; *Prince* v. *Massachusetts,* 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944); intervention in family matters by the state is justified, however, only when such intervention is actually "in the best interests of the child," a standard long used in this state. See General Statutes §§ 17-43a, 46b-129 (e); *State* v. *Anonymous,* 179 Conn. 155, 165, 425 A.2d 939 (1979); *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 661–62, 420 A.2d 875 (1979).

Studies indicate that the best interests of the child are usually served by keeping the child in the home with his or her parents. "Virtually all experts, from many different professional disciplines, agree that children need and benefit from continuous, stable home environments." Institute of Judicial Administration—American Bar Association, Juvenile Justice Standards Project, Standards Relating to Abuse and Neglect, p. 45 (Tentative draft, 1977) (IJA-ABA, STDS). The love and attention not only of parents, but also of siblings, which is available in the home environment, cannot be provided by the state. Unfortunately, an order of temporary custody often results in the children of one family being separated and scattered to dif-

ferent foster homes with little opportunity to see each other. Even where the parent-child relationship is "marginal," it is usually in the best interests of the child to remain at home and still benefit from a family environment.[11]

The defendants' challenge to the temporary custody statute, § 46b-129 (b), must be addressed in light of the foregoing considerations. The defendant contends that only when the child is "at risk of harm" does the state's interest become a compelling one, justifying even temporary removal of the child from the home. We agree.

In custody proceedings, any criteria used to determine when intervention is permissible must take into account the competing interests involved.

[11] Uninterrupted home life "comports . . . with each child's biological and psychological need for unthreatened and unbroken continuity of care by his parents. No other animal is for so long a time after birth in so helpless a state that its survival depends upon continuous nurture by an adult. Although breaking or weakening the ties to the responsible and responsive adults may have different consequences for children of different ages, there is little doubt that such breaches in the familial bond will be detrimental to a child's well-being." (Footnotes omitted.) Goldstein, "Medical Care for the Child at Risk: On State Supervision of Parental Autonomy," 86 Yale L.J. 645, 649 (1977). Separation from his or her parents for any significant time has damaging effects on a child, even when the parents are minimally supportive of the child's needs. See Goldstein, Freud and Solnit, Before the Best Interests of the Child, pp. 6-12 (1979); Wald, "State Intervention on Behalf of 'Neglected' Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights," 28 Stan. L. Rev. 623 (1976); Goldstein, Freud and Solnit, Beyond the Best Interests of the Child, p. 20 (1973). "Even when placed in good environments, which is often not the case, they suffer anxiety and depression from being separated from their parents, they are forced to deal with new caretakers, playmates, school teachers, etc. As a result they often suffer emotional damage and their development is delayed." Wald, "Thinking About Public Policy Toward Abuse and Neglect of Children," 78 Mich. L. Rev. 645, 662 (1980).

The parent has only one interest, that of family integrity; *Stanley* v. *Illinois,* supra, 651; and the state has only one compelling interest, that of protecting minor children. *Lassiter* v. *Department of Social Services,* 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981); *Sims* v. *State Department of Public Welfare,* 438 F. Sup. 1179, 1191 (S.D. Tex. 1977), rev'd on other grounds sub nom. *Moore* v. *Sims,* 442 U.S. 415, 99 S. Ct. 2371, 60 L. Ed. 2d 994 (1979). The child, however, has two distinct and often contradictory interests. The first is a basic interest in safety; the second is the important interest, discussed above, in having a stable *family* environment. Connecticut's child welfare statutes recognize both the conflicting interests and the constitutional limitations involved in any intervention situation. Thus, under the criteria of General Statutes § 17-38a (e), summary assumption of temporary custody is authorized only when there is probable cause to believe that "the child is suffering from serious physical illness or serious physical injury or is in *immediate* physical danger from his surroundings, *and* that *immediate* removal from such surroundings is *necessary* to insure the child's safety . . . ." (Emphasis added.)

The language of § 17-38a (e) clearly limits the scope of intervention to cases where the state interest is compelling, as required by the first part of the test from *Roe* v. *Wade,* supra. Intervention is permitted only where "serious physical illness or serious physical injury" is found or where "immediate physical danger" is present. It is at this point that the child's interest no longer coincides with that of the parent, thereby diminishing the magnitude of the parent's right to family integrity; *In re Angelia P.,* 28 Cal. 3d 908, 916–17, 623 P.2d 198 (1981); and

therefore the state's intervention as parens patriae to protect the child becomes so necessary that it can be considered paramount. *Alsager* v. *District Court,* 406 F. Sup. 10, 22-23 (S.D. Iowa 1975). A determination that the state interest is compelling does not alone affirm the constitutionality of the statute. More is needed. The second part of the due process analysis of *Roe* v. *Wade,* supra, requires that statutes affecting fundamental rights be "narrowly drawn to express only the legitimate state interests at stake." General Statutes § 17-38a (e) meets this part of the test by requiring, in addition to the compelling need to protect the child, that the assumption of temporary custody by the commissioner be immediately "necessary to insure the child's safety." This phrase requires that various steps short of removal from the home be used when possible in preference to disturbing the integrity of the family. The statute itself mentions supervised in-home custody, but a wide range of other programs short of removal are a part of existing DCYS procedure. See DCYS: *Programs and Priorities,* FY 1979.

The challenged statute, § 46b-129 (b), does not contain the "serious physical illness or serious physical injury" or "immediate physical danger" language of § 17-38a (e). We note, however, that § 46b-129 (b) does limit the temporary custody order to those situations in which "the child or youth's condition or the circumstances surrounding his care require that his custody be immediately assumed to safeguard his welfare." It is axiomatic that statutes on a particular subject be "considered as a whole, with a view toward reconciling their separate parts in order to render a reasonable overall interpretation . . . . We must avoid a conse-

quence which fails to attain a rational and sensible result which bears most directly on the object which the legislature sought to obtain." *LaProvidenza* v. *State Employees' Retirement Commission,* 178 Conn. 23, 29, 420 A.2d 905 (1979); see *United Aircraft Corporation* v. *Fusari,* 163 Conn. 401, 414, 311 A.2d 65 (1972). This is no less true when the legislature has chosen to place related laws in different parts of the General Statutes. Therefore, the language limiting coercive intervention in chapter 301 ("Child Welfare"), § 17-38a, must be read as applying equally to such intervention in chapter 815t ("[Family Law] Juvenile Matters"), § 46b-129. Because we hold that General Statutes § 46b-129 (b) may be applied only on the basis of the criteria enunciated in § 17-38a, we reject the defendant's claim that § 46b-129 (b) is unconstitutional.[12]

In the instant case, no substantial showing was made at the temporary custody hearing that the defendant's five children were suffering from either

[12] The American Bar Association Juvenile Justice Standards Project, after a thorough study of the competing individual, societal, and legal interests involved when state intervention into family affairs is contemplated, developed model Standards Relating to Abuse and Neglect (Tentative Draft, 1977) (IJA-ABA, STDS). The basic policy assumptions underlying the study mirror our own law, i.e., "[s]tate intervention should promote family autonomy and family life. . . . [But] where a child's needs . . . conflict with his/her parents' interests, the child's needs should have priority." ABA Standard 1.5. When interpreting the "at risk" criteria set forth in General Statutes § 17-38a (e), the following guidelines may be considered insofar as they help to define more clearly our own statutes pertaining to temporary custody orders:

"Courts should . . . assume jurisdiction in order to condition continued parental custody upon the parents' accepting supervision or to remove a child from his/her home only when a child is endangered in a manner specified in subsection A.–F.:

"A. a child has suffered, or there is a substantial risk that a child will imminently suffer, a physical harm, inflicted nonaccidentally

serious physical illness or serious physical injury, or that they would be in immediate physical danger if they were returned to the defendant's home. The DCYS caseworker admitted at trial, as did the state's counsel at argument before this court, that without the unexplained death of Christopher there was no reason for DCYS to have custody of the other children. The medical evidence at the hearing indicated no connection between Christopher's death and either the defendant or the conditions in her home. While the final autopsy report was not available at the hearing, the pediatrician testified that the marks on Christopher's body were *not* related to the child's death. There was, therefore, no evidence before the court to indicate whether his death was from natural causes or was the result of abuse. Yet with nothing before it but subjective suspicion, the court granted the commissioner custody of the defendant's other children. It was

---

upon him/her by his/her parents, which causes, or creates a substantial risk of causing disfigurement, impairment of bodily functioning, or other serious physical injury;

"B. a child has suffered, or there is a substantial risk that the child will imminently suffer, physical harm causing disfigurement, impairment of bodily functioning, or other serious physical injury as a result of conditions created by his/her parents or by the failure of the parents to adequately supervise or protect him/her;

"C. a child is suffering serious emotional damage, evidenced by severe anxiety, depression, or withdrawal, or untoward aggressive behavior toward self or others, and the child's parents are not willing to provide treatment for him/her;

"D. a child has been sexually abused by his/her parent or a member of his/her household . . . ;

"E. a child is in need of medical treatment to cure, alleviate, or prevent him/her from suffering serious physical harm which may result in death, disfigurement, or substantial impairment of bodily functions, and his/her parents are unwilling to provide or consent to the medical treatment;

"F. a child is committing delinquent acts as a result of parental encouragement, guidance, or approval." ABA Standard 2.1.

error for the court to grant to the commissioner temporary custody when no immediate risk of danger to the children was shown.

It appears from this record that DCYS has not heeded the suggestion of this court that the agency bears a responsibility of continuing review of cases it is litigating. In *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 662, 420 A.2d 875 (1979), we stated that when the cause for the commitment of children to DCYS custody ends, the state bears the burden of showing the necessity to continue the commitment. Although that holding concerned a parent's petition for revocation of a commitment, implicit in our holding was that the state had a duty to seek the best interests of the child even after adversary proceedings with the parent had begun. In this case, at some time shortly after the orders of temporary custody were granted, the state received the final autopsy report which effectively exonerated the defendant from any wrongdoing in Christopher's death. The reason for the custody order then no longer existed. It was then incumbent on DCYS to reunite the family. "In this situation, the state cannot constitutionally 'sit back and wait' for the parent to institute judicial proceedings. It 'cannot . . . [adopt] for itself an attitude of "if you don't like it, sue. " ' " *Duchesne* v. *Sugarman,* 566 F.2d 817, 828 (2d Cir. 1977).[13]

---

[13] We recognize that there are three parties to litigation in the Superior Court for juvenile matters—DCYS, the parent, and the child (through a guardian ad litem appointed pursuant to Practice Book § 484) and that any of these parties could have moved to terminate this litigation in a number of ways. We are saying only that DCYS, acting as parens patriae, had a duty to do so.

This court notes, however, that the defendant mother took no steps either to revoke custody under General Statutes § 46b-129 (f) or to pursue a judicial resolution of the neglect petitions. We are

Petitions for neglect and for temporary custody orders, like the petitions to terminate parental rights in *Duchesne* v. *Sugarman,* supra, or in *In re Juvenile Appeal (Anonymous),* supra, "are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents [or foster parents]." *In re Juvenile Appeal (Anonymous),* supra, 672.

This case clearly shows that these dangers do exist. It is shocking that the defendant's children have been in "temporary" custody for more than three years. This is a tragic and deplorable situation, and DCYS must bear full responsibility for this unwarranted and inexcusable delay. Too often the courts of this state are faced with a situation where, as here, litigation has continued for years while the children, whose interests are supposed to be paramount, suffer in the insecurity of "temporary" placements. The well-known deleterious effects of prolonged temporary placement on the child, which we have discussed above, makes continuing review by DCYS of all temporary custody and commitment cases imperative. Where appropriate, the agency can and must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings.

even more concerned that the attorney for the children took no steps to protect their interests in family integrity by insisting on a resolution of the neglect petitions, and failed to represent their interests before this court. This court, therefore, is appreciative of the fact that the interests of the children have been ably represented by the Connecticut Civil Liberties Union as amicus curiae on this appeal.

The failure of DCYS properly to administer § 46b-129 does not, however, affect its constitutionality. The statute is constitutional because when it is read together with § 17-38a, as it must be, it is justified by a compelling state interest and is narrowly drawn to express only that legitimate state interest. *Roe* v. *Wade,* supra.

## II

### BURDEN OF PROOF; STANDARD OF PROOF

The defendant's children were initially removed from her custody pursuant to the ninety-six hour hold provision of General Statutes § 17-38a (e). As explained above, this statute allows the commissioner of children and youth services to remove a child temporarily from the home, without court order, if the commissioner has probable cause to believe that the child is suffering from serious physical illness or physical injury, or is in immediate physical danger. The plaintiff commissioner promptly filed petitions of neglect with the Superior Court under General Statutes § 46b-129 (b), accompanied by a request for an ex parte order that the commissioner could retain custody pending an adversary hearing on temporary custody. § 46b-129 (b) (2). Section 46b-129 (b) provides for court ordered temporary custody in either of two ways after a neglect petition is filed. Under subsection (1) of § 46b-129 (b), the court may issue to the parents an order to show cause why the court should not vest custody in the commissioner.[14] Under sub-

---

[14] Although § 46b-129 (b) (1) was not used here, and is not challenged here, our discussion of the temporary custody statute would be incomplete if we did not make clear that the burden of proof at the order to show cause hearing remains on the state. As discussed in detail in our opinion, where the state seeks to obtain custody of children, the fundamental right to family integrity is at

section (2), used in this case, if the court has "reasonable cause to find" that "the circumstances surrounding [the child's] care require that his custody be immediately assumed to safeguard his welfare . . . ," the court may issue a temporary custody order ex parte, "pending a hearing upon the petition [for temporary custody] which shall be held within ten days . . . ." This procedure is in two steps: first, upon a "reasonable cause" finding, the court may issue an ex parte temporary custody order of no more than ten days duration; and, second, a noticed temporary custody hearing must be held within ten days to determine whether the ex parte order should be confirmed.

In this case, the unexplained death of Christopher, combined with the marks on his body, was sufficient to support a finding under § 17-38a (e) that there was probable cause to believe that the defendant's other children might be "in immediate physical danger," as required for removal from the home under the standards enunciated earlier in this opinion. Therefore, both the initial seizure by DCYS under the ninty-six hour hold provision of § 17-38a (e), and the court's decision to issue an ex parte temporary custody order under the first step of § 46b-129 (b) (2) on September 7, 1979, were entirely proper. Neither of these actions is challenged here.

stake, and the burden of proof remains on the party challenging that right. This is so even though the procedures in the statute involve issuing the parents an order to show cause. Merely by appearing in response to the order to show cause, the parent invokes the presumption in favor of maintaining the family intact. See *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 663-64, 420 A.2d 875 (1979).

The court below erred, however, at the second step of § 46b-129 (b) (2) when it confirmed its order of temporary custody after taking evidence at the temporary custody hearing on September 14, 1979, and October 1, 1979. On the basis of testimony heard on those two days, the court found "probable cause" to continue custody in the commissioner, and concluded that the defendant's children were "presumptively neglected and uncared-for children whose return to parental care would not adequately assure their well being prior to an adjudication on the merits of the petitions alleging their neglect." The defendant claims that the court erred by presuming neglect and by requiring "probable cause" as the burden of proof, thereby effectively shifting the burden of proof to the defendant. We agree. We hold that the burden of proof is always on the state when it seeks to remove children from the home. We hold further that the standard of proof to be used in temporary custody hearings under General Statutes § 46b-129 (b) (2) is the normal civil standard of a fair preponderance of the evidence.

## A

### BURDEN OF PROOF

We noted above that it is both a fundamental right and the policy of this state to maintain the integrity of the family. Where a fundamental right is involved, the burden of proof is always on the party seeking to interfere with that right. *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 662, 420 A.2d 875 (1979). The trial court's conclusion that the children were "presumptively neglected" impermissibly shifted to the defendant the burden of proof to show that the children were not neglected, and was, therefore, error.

## B

### STANDARD OF PROOF

General Statutes § 46b-129 (b) establishes a reasonable cause standard of proof for the issuance of ex parte orders of temporary custody, but does not prescribe the standard of proof required in the second stage of proceedings under that section, when an adversary evidentiary temporary custody hearing is held. Where no standard of proof is provided in a statute, due process requires that the court apply a standard which is appropriate to the issues involved.

In *Santosky* v. *Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), the United States Supreme Court held that in hearings on petitions to terminate parental rights, due process requires that the state prove statutory termination criteria by "clear and convincing evidence" rather than by the normal civil standard of a "fair preponderance of the evidence." *Santosky* v. *Kramer,* supra, 769–70. The defendant urges us to adopt the same higher standard of proof for hearings on temporary custody, while the state suggests that the court below was correct in applying a "probable cause" standard. We reject both suggestions and hold that the proper standard of proof in temporary custody hearings is the normal civil standard of a fair preponderance of the evidence. See *Darrow* v. *Fleischner,* 117 Conn. 518, 519–20, 169 A. 197 (1933). The party seeking a change in custody, in this case the state, must prove by a fair preponderance of the evidence that custody should be taken from the parent and vested in the commissioner on a temporary basis under the criteria established in § 46b-129 (b).

Despite the Supreme Court determination in *Santosky,* supra, that parental termination hearings require the higher standard, we reject the "clear and convincing evidence" standard for temporary custody hearings because: (1) the nature of the private interests concerned in the two kinds of hearings differs, and (2) the deprivation of rights in a temporary custody adjudication is neither final nor irrevocable.

" 'The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he [or she] may be "condemned to suffer grievious loss." ' [Citation omitted.] Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss." *Santosky* v. *Kramer,* supra, 758. "[T]he minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed . . . ." Id., 755.

## 1. Private Interests

In the termination of parental rights hearing discussed in *Santosky,* the United States Supreme Court emphasized that only the fundamental family integrity interest of the parent was at stake. "The factfinding [hearing] does not purport—and is not intended—to balance the child's interest in a normal family home against the parents' interest in raising the child. . . . Rather, the factfinding hearing pits the State directly against the parents." *Santosky*

v. *Kramer*, supra, 759. In a hearing on temporary custody, however, the child's interests are very much at issue. We hold today that no temporary custody order may issue unless the child is suffering from serious physical illness or serious physical injury or is in immediate physical danger. We also hold that the child's safety pending further proceedings is the primary concern of a temporary custody hearing. Therefore, there are two competing interests—the safety of the child and the parent's right of family integrity—at stake in a temporary custody hearing, whereas only the parent's family integrity interest is directly involved in the fault stage of a termination of parental rights proceeding like that in *Santosky*. The child, of course, has an interest both in safety and in family integrity. The state, as parens patriae, represents the safety interest of the child in custody proceedings. This interest must be balanced against the combined family integrity interests of parent and child, which are represented by the parent. An elevated standard of proof cannot protect the child's interests, because some interest of the child is adversely affected whether the state or the parent prevails. The child's interests are best protected not by an elevated standard of proof, but by the "risk of harm" standards enunciated today.

Where two important interests affected by a proceeding are in relative equipoise, as they are in this situation, a higher standard of proof would necessarily indicate a preference for protection of one interest over the other. See *In Re Winship*, 397 U.S. 358, 371, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring). We see no reason to make such a value determination, and find that the various interests in a temporary custody hear-

ing are best served by applying the normal civil standard of proof which is a fair preponderance of the evidence.

## 2. Permanency of Deprivation of Rights

The fair preponderance of the evidence standard is also appropriate in § 46b-129 (b) hearings because of the temporary nature of the orders contemplated by these proceedings. In *Santosky* v. *Kramer,* supra, 759, the court emphasized that an elevated standard of proof was required because the "decision terminating parent rights is *final* and irrevocable." (Emphasis in original.) A decision granting temporary custody to the commissioner of children and youth services certainly affects important rights of the parent and the child, as explained in part I of our opinion. The decision, however, is neither final nor irrevocable. The determination is necessarily reviewed during the hearings on the neglect petition under § 46b-129 (a) and (c).[15] It is also reviewable upon a petition for revocation of custody filed, inter alia, by the parent or by DCYS under § 46b-129 (g);[16] and, therefore, the

[15] General Statutes § 46b-129 (c) provides: "When a petition is filed in said court for the commitment of a child or youth, the commissioner of children and youth services shall make a thorough investigation of the case and shall cause to be made a thorough physical and mental examination of the child or youth if requested by the court. The court after hearing on the petition and upon a finding that the physical or mental ability of a parent or guardian to care for the child or youth before the court is at issue may order a thorough physical or mental examination, or both, of the parent or guardian whose competency is in question. The expenses incurred in making such physical and mental examinations shall be paid as costs of commitment are paid."

[16] General Statutes § 46b-129 (g) provides: "Any court by which a child or youth has been committed pursuant to the provisions of this section may, upon the application of a parent, including any person who acknowledges before said court paternity of a child or youth born out of wedlock, or other relative of such child or youth, the selectman or any original petitioner, or a licensed child-

deprivation of the parent's right to care and custody of his or her children is much less serious in a temporary custody hearing than in the *Santosky* termination of parental rights proceeding.

In conclusion, we hold that the fair preponderance of the evidence standard of proof must be applied in temporary custody proceedings, both because the private interests involved are relatively balanced between the safety of the child and the combined family integrity interests of parent and child, and also because any deprivation of rights is both temporary and reviewable.

There is error, and the case is remanded with direction to set aside the orders of temporary custody.

In this opinion Peters, Parskey and Grillo, Js., concurred.

---

caring agency or institution approved by the commissioner, or said commissioner, and while such child or youth is under the guardianship of said commissioner, upon hearing, after reasonable notice to said commissioner, and, if said commissioner made the application, after reasonable notice to such parent, relative, original petitioner, selectman or child-caring agency or institution, upon finding that cause for commitment no longer exists, revoke such commitment, and thereupon such guardianship and all control of said commissioner over such child or youth shall terminate. The court may further revoke the commitment of any child or youth upon application by the commissioner or by the child or youth concerned and after reasonable notice to the parties affected upon a finding that such revocation will be for the best interest and welfare of such child or youth. No hearing shall be held for such reopening and termination of commitment or transfer of commitment more often than once in six months, except upon the application of said commissioner."

We reiterate that it is the continuing duty of DCYS to review the custody situation and to petition the court to return custody to the parent if and when the original reasons for the change in custody no longer exist. See footnote 11, supra.

SHEA, J. (concurring). I agree with the result and with the essential holdings of the court (1) that the trial court applied an incorrect standard of proof ("probable cause") and (2) that the proper standard for temporary orders of custody under General Statutes § 46b-129 (b) is preponderance of the evidence.

I disagree with the holding "that [General Statutes] § 46b-129 (b) is constitutional because it must be read together with [General Statutes] § 17-38a which contains adequate criteria for determining whether temporary custody of children may be taken from the parent by court order." Section 46b-129 (b) itself contains a constitutionally sufficient standard for state intervention: "that the child's or youth's condition or the circumstances surrounding his care require that his custody be immediately assumed to safeguard his welfare." Of course, it is only where a petition for commitment of a child as "neglected, uncared-for, or dependent, within the meaning of § 46b-120" has been brought in accordance with General Statutes § 46b-129 (a) that a temporary custody order may be issued under § 46b-129 (b). The reference in § 46b-129 (b) to "the child's or youth's condition or the circumstances surrounding his care" clearly pertains to the facts necessary for a finding that a child or youth is "neglected, uncared for or dependent" as those terms are defined in § 46b-120.[1] It is only where the circumstances, which would establish the

---

[1] General Statutes § 46b-120 defines the terms "neglected," "uncared for," and "dependent" as follows:

"[A] child or youth may be found 'neglected' who (i) has been abandoned or (ii) is being denied proper care and attention, physically, educationally, emotionally or morally or (iii) is being permitted to live under conditions, circumstances or associations injurious to his well-being, or (iv) has been abused . . . .

existence of one of these statutory grounds for commitment, indicate by a fair preponderance of the evidence that the custody of the child must be immediately assumed in order to safeguard his welfare that such a temporary transfer of custody may be ordered. The difference between the standard expressed in § 46b-129 (b) and that in § 17-38a (e) ("that the child is suffering from serious physical illness or serious physical injury or is in immediate physical danger from his surroundings, and that immediate removal from such surroundings is necessary to insure the child's safety") is that the latter focuses exclusively on physical danger while the former is broad enough to include other situations involving serious harm to a child, such as where a parent is using a child for the purpose of prostitution, obscene photographs, or other kinds of degrading exploitation. Immediate intervention by the state is as much warranted in those circumstances as where there is physical abuse or the threat of it. I do not believe that the wider scope of the standard expressed in § 46b-129 (b) as compared to § 17-38a jeopardizes its constitutionality in any way.

There is nothing in the legislative history of § 17-38a and § 46b-129 (b) which indicates that the legislature intended to have the former read into the latter. Section 46b-129 (b) antedated § 17-38a by many years. Public Acts 1933, No. 225 (2). I see

"[A] child or youth may be found 'uncared for' who is homeless or whose home cannot provide the specialized care which his physical, emotional or mental condition requires.

"[A] child or youth may be found 'dependent' whose home is a suitable one for him, save for the financial inability of his parents, parent, guardian or other person maintaining such home, to provide the specialized care his condition requires."

no reason to narrow the scope of § 46b-129 (b) so that it will apply only to physical danger to a child when ordinary rules of construction indicate that the legislature intended no such restriction.