[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Articulation of Order Vacating Order of Temporary Custody
Summary of Court Action
On July 8, 1999, an ex parte Order of Temporary Custody (OTC) given on June 28, 1999 on an affidavit of a social worker employed by the Department of Children and Families (DCF), was vacated suo moto., without an evidentiary hearing, upon submission to the court of documentation that the "imminent risk of physical danger" suggested by the application for the OTC no longer existed. The original OTC, having been given upon written allegations of homelessness submitted by the petitioning DCF, was vacated upon written evidence of changed circumstances (a rent receipt for the coming month)submitted by the respondent parents, and the child, after two weeks in foster care, was immediately restored to the custody of his parents.
Legal Authority
1. Statutory: The criteria for the granting of OTCs is CT Page 10749 currently set forth in subsection (b) of Sec. 46b-129 of the Connecticut General Statutes, Rev. 1998, as enacted by Public Act 98-241.
2. Case law: The seminal case on OTCs, the rule of which provided the language used in P.A. 98-241, as In Re Juvenile Appeal (83-CD), 189 Conn. 276 (1983), a unanimous decision written by then Chief Justice John Speziale and handed down on February 5, 1983. In that case, OTCs had been given on the siblings of a child whose death was a suspected homicide based upon various bruises on his body. By the time of the hearing on the OTCs given on the child's siblings, medical evidence could not support any connection between those bruises and the child's death from apparent natural causes. Nonetheless, the court that conducted the OTC hearings sustained the orders, leaving the siblings of the deceased child in the temporary custody of the Department of Children and Youth Services (DCYS), the then counterpart of today's DCF. The Supreme Court found that the potentially unconstitutionally vague criteria for judicial orders of temporary custody that then existed were made sufficiently specific by reading into them the statutory criteria for the administrative removal of children prior to the securing of court orders, the so-called "96 hour hold" permitted by subsections (c) and (d) of Sec. 17a-101g. The Court added its own emphasis to the significant words in those criteria:
 ". . . the child is suffering from serious physical illness or serious physical injury or is in immediate
physical danger from his surroundings, and that immediate removal from such surroundings is necessary
to insure the child's safety. (Emphasis added.)" 189 Conn. at 287
In the lengthy opinion, the Court held it to be reversible error for DCYS to have kept in temporary custody the siblings of the dead child after medical experts had testified that there was no evidence that the child had died of abuse rather than from natural causes:
 It was error for the court to grant to the commissioner temporary custody when no immediate risk of danger to the children was shown . . . DCYS has not heeded the suggestion of this court that the agency bears a responsibility of continuing review of cases it is litigating . . . In this case, at some time shortly after CT Page 10750 the orders of temporary custody were granted, the state received the final autopsy report which effectively exonerated the defendant from any wrongdoing in Christopher's death. The reason for the custody order then no longer existed. It was then incumbent on DCYS to reunite the family."
(Id. at pp. 290-291.)
In a footnote to this portion of his opinion, the Chief Justice noted that while the agency, the parents or the children through their guardians-ad-litem could have moved to end the litigation,". . . DCYS, acting as parens patriae, had a duty to do so". (Footnote 13, Id. at p. 291.) [Emphasis added.]
Basis for the issuance of the OTC on June 28, 1999
On June 28, 1999 DCF filed a petition in this court alleging Zarko H., born in Bosnia on 9/25/89, to be neglected in that he
1. Had been abandoned;
2. Was being denied proper care and attention, physically, educationally, emotional [sic] or morally;
3. Was being permitted to live under conditions, circumstances or associations injurious to his/her well-being;
and further was also uncared-for in that he was homeless, within the definitions found in Sec. 46b-120 of the Conn. Gen. Stats. The Jurisdictional Facts supporting these allegations consisted of the following (quoted in their entirety):
Parents refused services to assist them in obtaining housing and financial assistance.
The parents are, [sic] homeless and are temporarily residing in a transitional living shelter.
The child has not had a current physical and his medical needs are not being met.
The parents are not employed and are not seeking employment.
It is noteworthy that none of these "jurisdictional facts" allege any specific negative impact on Zarko from any of the alleged derelictions of parental responsibility (i.e. that Zarko CT Page 10751 was ill, malnourished, emotionally deprived, inappropriately disciplined or inadequately supervised) despite the requirement of Sec. 32-1(a) of the Practice Book that the petitioner in a neglect case set forth with reasonable particularity, including statutory references, the "specific conditions which haveresulted in the situation which is the subject of the petition".
The accompanying Summary of Facts (which, as required by subsection (b) of Section 32-1 of the Practice Book, is intended to substantiate, not substitute for, the allegations of the petition,) documents efforts made by DCF, between May 28 and June 24, 1999, to compel the parents to complete necessary paperwork to secure funds for family support, for subsidized housing, for medical assistance for Zarko and for continued residence in the temporary shelter where they had been placed after being evicted from their prior residence. The father, who spoke no English, and the mother, who spoke very little, refused to sign any documents that would permit the release of these funds and services. On June 23, the shelter informed the parents (and DCF) that because of this failure to submit the required paperwork, they could no longer remain in the shelter and would have to leave the following day. The next day, the DCF social worker, accompanied by Bridgeport police officers, made one last effort to persuade the Serbian-speaking parents to cooperate with the paperwork requirements, warning them if they did not do so ". . . the family would be homeless and the agency would most probably seek foster placement for their son". [Emphasis added.] What was described as "most probable" was put into motion the next moment when, after the parents "flatly [sic] refused to cooperate", the social worker, with the help of the Bridgeport police officers who were, presumably, previously summoned for this purpose, placed nine-year old Zarko in the state car and secured a "96 hour hold" pursuant to Sec. 17a-101g(c) and (d) of the Conn. Gen. Stats. (Quotations from the unnumbered third page of the document dated June 28, 1999, captioned "Summary of Facts Substantiating Allegations of Neglect".)
The social worker's affidavit, although presumably intended to cover only those circumstances that placed Zarko at imminent risk of physical danger and made his immediate removal necessary to secure his safety, was nearly a verbatim copy of the entire Summary of Facts, the principal difference being that the affidavit is set out on four unnumbered pages, and concludes with the familiar boilerplate paragraph inexplicably employed by DCF in all requests for temporary custody: "WHEREFORE, there is CT Page 10752 reasonable cause to believe that based on the aforementioned investigation, that this child would be in immediate physical danger from her [sic] surroundings, and that as a result of said conditions, the child's safety is endangered and immediate removal from such surroundings is necessary to ensure the child's safety."
No description of "such surroundings" can be found in the Summary or in the Affidavit, nor does the petition, or either of the accompanying documents, contain any allegation of past educational neglect (even if educational neglect presented any immediate danger necessitating removal to ensure physical safety) notwithstanding the alleged "concern" of the Department "that Zarko, age nine, has not had a physical examination for school admission . . . [since] the parents refused to comply with the requirement for medical care for their child". Clearly, there could be no allegation of current educational neglect during the summer holidays and, according to the pleadings, Zarko had, in fact, entered the State of Connecticut at the outset of the 1998-1999 school year. As stated above, the petition also contained no allegation that Zarko had, since entering Connecticut nine months earlier, ever been denied adequate food, housing, medical care or supervision. The affidavit, however, is rich in colorful verbs and adverbs: When the worker "pleaded" with the parents, they "flatly" refused to cooperate; after placing in his state car the little boy whose parents had safely shepherded him through their nightmare preceding leaving Bosnia for the safety they hoped to find in the United States, the social worker describes them, despite their lack of English, as being "belligerent", refusing to "cooperate". Most curious of all was the following statement: "The parents stated that they lost one son in the Bosnia [sic] war and therefore losing another son was no big deal." [Emphasis added.] How such a trendy American expression of the late `90's could be expressed in Serbian, with or without an interpreter, is not made clear from the affidavit.
The allegation that these parents "abandoned" their son after he had been placed by the social worker in a state car — "A Bridgeport Police Officer assisted with the removal" — presumably is based upon the sentence that follows: "The parents simply walked away leaving their son with this social worker." It takes little imagination to envision the experiences this family may have had in Bosnia — possibly even with the assistance of uniformed Serbian police officers — that would dictate such a reaction to any imposition of governmental force upon powerless CT Page 10753 civilians.
The literary quality of the social worker's affidavit was further displayed in the next paragraph which appears to be wholly irrelevant to the issue of whether the expulsion of the family from the shelter placed Zarko at "imminent risk of physical danger from his surroundings" so great that his "immediate removal" from those surroundings was "necessary" (for a nine-year old boy with two parents on a hot summer night) to ensure his safety:
 Zarko has adjusted well to foster placement. He did not cry or demonstrate any negative reaction to separation from his parents. Zarko, however, has expressed worry as to where his parents will sleep without him and when he will see them again. This worker brought Zarko to McDonalds and he happily enjoyed his first ever happy meal. [Emphasis added.] He has received much attention during his short stay in foster care including many gifts of clothing and toys.
The Hearing on July 8, 1999
Both parents appeared in the court building at 9 a.m, over an hour before the scheduled initial hearing on their son's removal by the social worker and police officers two weeks earlier. Without the help of an interpreter, who was unavailable until the afternoon, and with only the mother's limited ability with English, the parents refused to fill out the financial affidavit necessary for the appointment of counsel for indigent parents in these proceedings. They expressed no need for an attorney since they claimed they now had an apartment and therefore there was no reason why Zarko could not return home. The court nonetheless ordered the appointment of an attorney for these parents whose indigence was attested to by the pleadings submitted by DCF. After the arrival of the judicial department interpreter that afternoon, the court-appointed attorney, in less than an hour, was able to ease the parents beyond their presumed initial distrust sufficiently to represent to the court on their behalf:
1. They had obtained an apartment with the assistance of a local refugee assistance agency, notwithstanding the DCF allegation that they had previously "refused assistance from the Bosnia [sic] community in Bridgeport, per the [different; not from the judicial department] interpreter"; CT Page 10754
2. The father had an offer of a job, the only impediment being his refusal to sign a necessary document, written only in English, before he was able to learn its content in his own language;
3. The parents had not "lost one son in the Bosnia war", Zarko being the only child born to them;
4. Losing Zarko was, indeed, "a big deal" as evidenced by their demeanor and affect, as well as their interpreted responses.
By mid-afternoon, all parties, including the child and his court-appointed counsel and guardian-ad-litem, gathered in the courtroom. The petitioner was asked whether, under these circumstances, after it had confirmed that the parents had secured an apartment for the coming month, the Department would agree to dissolve the OTC and allow Zarko to go home pending the full trial on the underlying petition. When petitioner's counsel responded that". . . DCF's position is that the OTC was based on more than just the reason of homelessness" (Transcript, p. 6), he was pressed to articulate what was this "more". The only response was that the parents had been cut off from further state aid by their non-cooperation. Whether or not these parents had any other sources of income for the coming month, the fact that the pleadings are wholly devoid of any allegation that this child had ever been denied any necessary food, shelter, education, medical care or supervision while with his parents suggests that any neglect caused by the anticipated lack of future income is, at best, purely speculative and predictive, far from being "imminent". Against the speculation of neglect if the parents' non-cooperation with authorities should continue to the point where Zarko did become hungry or sick some time in the future must be weighed the absolute certainty of immediate psychological trauma to this child if his separation from his parents should be prolonged. Therefore, the court ruled that from the documentation submitted for the OTC,". . . the only imminent risk of any conceivable injury was from the fact that they were being discharged from the shelter on June 24th." (Transcript, p. 11.)
Whether or not being evicted from a temporary shelter constituted "homelessness" for a nine year old boy in the summertime, and whether or not such "homelessness" presented for him any risk of physical danger so immediate as to render his CT Page 10755 removal from his parents, without a hearing, necessary to insure his safety are, as the Assistant Attorney General correctly stated, issues on which DCF, having secured an ex parte OTC from one judge is entitled to an evidentiary hearing before another.[1] However, the circumstances under which that OTC was granted on June 24 had changed: A written rent receipt for $650 dated July 7, which was displayed by the parents through their attorney, constitutes documentation that the homelessness alleged to exist on July 24 when the child was taken on a "96 hour hold", and which continued to July 28 when the OTC was signed ex parte
no longer exists. If an ex parte OTC can be granted, without an evidentiary hearing, on the presentation of single piece of paper submitted by DCF suggesting that the child may be homeless, in fairness to families for which the "F" in "DCF" stands it should be dissolvable by means of credible documentation that circumstances have changed, and that the homelessness, for at least the next month, is over. The suggestion made by counsel for the petitioner that the housing is only assured for one month and that the Department might ". . . then be back here in the same situation that we were in now. Where the parents have no established means to support themselves . . . and on that basis the department is not willing to vacate the OTC at this time" (Transcript, p. 13) displays a total disregard of the requirement that the risk of physical danger to a child must be immediate and
that his immediate removal from his parents is necessary to ensure his safety.
This is not a case where an OTC, secured on written documents, has been confirmed following an evidentiary hearing, and changed circumstances are subsequently alleged by the respondent parents. An OTC thus confirmed, it could be argued, should not be dissolved without a further evidentiary hearing. But where, as here, an OTC has been given on a social worker's written affidavit, fundamental fairness demands that the order be dissolved upon displaying to the court subsequently obtained written documentation of changed circumstances. For DCF to demand interrogation of the landlord under oath, or an inspection of the rented premises by DCF, before the written rent receipt could be regarded as documentation of a change in circumstances from those described in the social worker's affidavit is to weigh the scale even more heavily than it already is in favor of the State and against a family that is confused, naive, ill-informed, seriously traumatized and unable to speak the language of those, including uniformed police officers, who must appear to them to hold all the cards. CT Page 10756
While not yet explicitly required by Sec. 46b-129(b), the criteria for the issuance of an ex parte OTC — imminent physical danger PLUS the necessity for immediate removal to secure the child's safety — may reasonably be interpreted by the court implicitly to require a finding, upon appropriate documentation, that the predicted benefit to the child from being precipitately removed from immediate physical danger is not outweighed by the predictable emotional harm, or other detriment, resulting from such removal. At a time when predictive neglect, without statutory authority, has become the basis for filing an increasing number of petitions seeking removal of children from parental custody after full hearings, clinical evaluations, attempted mediation etc., purely predictive neglect should be sparingly used in the granting of OTCs. The only legal counterparts in the law to the granting of OTCs are such extreme measures as arrests without warrants or civil ex parte temporary restraining orders issued on allegations of irreparable harm if full hearings are required before restraints are imposed. No OTC should ever be granted without a finding by the court, based upon documented representations of DCF, that the predicted benefit to the child of immediate removal outweighs the reasonably predicted detriment from separating the child from his parents. Given the fact that at such an evidentiary hearing the state has the burden of convincing the court, by a reasonable preponderance of the evidence, of the necessity for immediate removal — a mere showing of probable cause being insufficient (ln Re Juvenile Appeal(83-CD), 189 Conn. at 295-300 — the prediction that the benefit of removal outweighs the detriment cannot be presumed, and should never be subject to the kind of "boilerplate" paragraph beginning "Whereas" which concludes every affidavit submitted by DCF in support of all OTCs. Sixteen years ago, such a presumption evoked a strong statement in Chief Justice Speziale's opinion:
. . . it is both a fundamental right and the policy of this state to maintain the integrity of the family. Where a fundamental right is involved, the burden of proof is always on the party seeking to interfere with that right. In Re Juvenile Appeal (Anonymous), 177 Conn. 648, 662, 420 A.2d 875 (1979). The trial court's conclusion that the children were `presumptively neglected' impermissibly shifted to the defendant the burden of proof to show that they were not neglected, and was, therefore, error. (189 Conn. at 295).
CT Page 10757 To suggest that even with the written rent receipt, Zarko H. should, nonetheless, remain away from his parents' care because he may have to be removed from home at some later date tempts the court into committing this kind of error.
Fifteen years later, the Connecticut Supreme Court (Katz, J.) reiterated this principle in a different context in Pamela B. v.Ment, 244 Conn. 296 (1998):
 Although a child's physical and emotional well-being outweighs the interest in preserving the family integrity, the disruption of a child's family environment should not be extended beyond what is unequivocally needed to safeguard and preserve the child's best interests. (244 Conn. at 313-314)
Conclusion
Because of the documentation of changed circumstances — the securing of an apartment for the coming month — and not because of any statement made by any person in the courtroom on July 8 pertaining to the accuracy of the social worker's affidavit on which the OTC was given on June 28, the court found that Zarko's removal from his parents was no longer necessary (if it ever had been) to ensure his continued safety. This leaves DCF with the right to seek a show cause hearing under subsection (b) of Sec.46b-129, on the issue of whether Zarko should be returned to foster care pending a full hearing on the underlying neglect petition, notwithstanding his parents' securing of an apartment for the next month. And the petitioning DCF continues to have a right to a full trial on any of the allegations of neglect on that petition which have not been eliminated by pretrial motions addressed to the pleadings therein.
Entered at Bridgeport this 5th day of August, 1999
Frederica S. Brenneman, Judge