MEMORANDUM OF DECISION
On June 22, 1998, the Department of Children and Families, hereafter "DCF", filed a petition for the termination of the parental rights of Beatrice G. and Eugene S. to their daughter, Sarah Jean S., then thirteen months old. Sarah had been removed from her parents when she was only a few days old, due to her mother's mental illness and drug addiction. Her father's psychiatric condition was also problematic, and he was incarcerated at that time. On July 3, 1999, Beatrice G. died and the petition was dismissed as to her. A trial on the petition against the father began on September 14, 1999. After hearing the testimony of the child's foster mother, Eugene S. consented to the termination of his parental rights. The court accepted his consent as knowingly and voluntarily made with the advice of competent counsel. The petition was amended to reflect his consent and the non-consensual grounds for termination of his parental rights withdrawn.
Consolidated with the petition for the termination of parental rights was the maternal grandmother's motion for revocation of commitment and transfer of custody and guardianship dated February 25, 1998. For the reasons stated below, the court denies the motion for revocation of commitment and finds termination of the parental rights of Eugene S. to be in the best interests of Sarah Jean S.
 A. Motion for Revocation of Commitment
The central initial question in any revocation hearing is whether or not a cause for the commitment" of the child still exists. In re Juvenile Appeal (85-BC), 195 Conn. 344,488 A.2d 790 (1985). As was stated In re Thomas L., 4 Conn. App. 56, 57,492 A.2d 229 (1985):
 "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests. On this point, when it is the natural parents who have moved to revoke commitment, the state must prove that it would not be in the best interests of the child to be returned to his or her natural parents." (Internal citations omitted).
The court concludes, by a fair preponderance of the evidence, CT Page 13084 that there remains cause for the commitment of Sarah as of September 15, 1999. At the time that Sarah's father entered his consent to the termination petition, he stated that in light of Sarah's specialized needs, he could not provide a home for her. Thus, no biological parent was available to care for this child.
DCF argues that this case is controlled by In re Denzel A.,53 Conn. App. 827, ___ A.2d ___ (1999) and that the motion for revocation should therefore be dismissed. The court disagrees. The court distinguishes the instant case from In re Denzel A., as in the quoted case the grandmother did not seek a revocation of commitment, but argued that the commitment to DCF should continue and the termination be denied, so that she could develop a relationship with the child. In this case, however, the grandmother, Josephine D., is seeking to have custody and guardianship of Sarah Jean transferred to her immediately. The next inquiry therefore is what is in Sarah's best interest, both with respect to the motion for revocation and the termination petition.
At trial, the foster mother, the two DCF social workers and the grandmother, Josephine D., all testified concerning the visitation between the maternal grandmother and Sarah Jean. While their interpretation of certain events differs, they all agree and the court so finds that Sarah Jean did not develop a relationship with her grandmother over the course of the six months in which visitation took place on a weekly basis. The visitation sessions began when Sarah Jean was ten months old. During every session, Sarah cried, at times inconsolably and hysterically. Only her foster mother or the social worker, whom she had known no longer than her grandmother, could comfort her. During the sessions, Sarah did not grow closer to her grandmother or her two other half-siblings and cousin, when they attended the sessions as well. By September, 1998, the visitation had become so difficult for her that it was suspended. As Josephine herself testified, "I do not know this child."
David M. Mantell, the court-appointed psychologist evaluator, evaluated the grandmother, Sarah Jean and her foster parents. He testified that during his evaluation of the grandmother and Sarah, he found "the child was distressed every time the grandmother approached or touched her or spoke to her." He concluded that the child had "an immediate aversive reaction to the presence of the grandmother either by sight or sound." He stated that Josephine was not doing anything wrong, but that "her CT Page 13085 behavior was so intense and manic that it was irritating to the child." It was his impression that her mannerisms were "scary" to the child. The foster parents, on the other hand, had a very warm close and comforting relationship with Sarah. He concluded that they had a close bond and this bond was sustaining to Sarah.
Dr. Mantell also spoke of the evaluation he had performed when Sarah Jean's half sister Caroline, known as CaryAnn, came to live with her grandmother in 1996. He evaluated the grandmother and CaryAnn in 1995 and noted that the relationship he observed then with CaryAnn was very different. As he noted, "one was very, very good and the other was very, very bad." In continuing his testimony concerning. Sarah Jean, he stated that the "costs to the child (of placing her with her grandmother) are very substantial." He stated "ordinarily we do not expose children to frightening circumstances." He concluded that in his professional opinion, such placement "would be detrimental to the child."
Sarah Jean, as does her half-sibling CaryAnn and her cousin Justin, suffers from muscular dystrophy. When Josephine D., the grandmother, was requested to make CaryAnn and the family medical history available to aid in the diagnosis of Sarah's condition when Sarah was thirteen months old, Josephine refused. While the testimony is that she later provided the requested information and records so that genetic testing could be conducted, this refusal, the court concludes, shows little insight into Sarah's needs. Oddly also, the grandmother explains Sarah Jean's reluctance to be comfortable in the grandmother's presence on the child's medical condition, her muscular dystrophy. Why her debilitating physical condition should have this particular emotional effect remains unexplained, as this child in general relates well to others. Considering Josephine D.'s training and employment as a registered nurse, it is all the more perplexing and of concern as to her ability to provide for the best interests and needs of this child.
Josephine D. testified at trial that she is seeking placement of her granddaughter in her home with her three other grandchildren. She testified that her deceased daughter had requested she do this and that she is taking this step because of her deathbed request and also because she is their grandmother. It is the blood relationship she focuses on and which also sustains her belief that she could provide a home for this child. She also noted that when Rachel came to reside with her, CaryAnn, the other granddaughter in her care, loved having a baby sister. CT Page 13086 She believes, despite the fact that during the visits with Sarah when Rachel spat at Sarah and hit her, that Rachel would love to have a baby sister. Her explanations were completely lacking any reference to what it is Sarah Jean might need or what difficulties she would face integrating this child into her family.
Contrasting Mrs. D.'s assertion that Rachel would enjoy having a baby sister was the testimony of the DCF social worker, Jean Norwig. Ms. Norwig stated that during the visits which Rachel attended, Rachel was unable to interact with Sarah Jean and that she had significant problems of her own. Rachel was then five, had very little language and was unable to focus. Rachel spit at Sarah Jean, on occasion hit her and bit her. At one point, she was so uncontrollable she was trying to bite her grandmother. Her grandmother, Ms. Norwig stated, had difficulty managing all the children during supervised visitation.
As has been noted, "it is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Dadio v. Dadio, 123 Conn. 88, 92.192 A.2d 557 (1937). And the court concludes, based on the testimony, that Josephine D. was not able to form a connection to Sarah Jean nor did she exhibit any understanding of her specialized needs, despite her familiarity with the child's medical condition as it afflicts two of the three other grandchildren in her care. The court concludes, from the evidence, that it would be detrimental for Sarah Jean to be placed with her grandmother and that the evidence is overwhelming that such action is not in her best interests.
 B. Best Interests of Sarah Jean re Termination of Parental Rights
The court has concluded that it is not in the best interests of Sarah Jean S. to be placed in the care of her maternal grandmother. Her sole surviving parent, her father, consented to the termination of his parental rights and the court accepted his consent. The court therefore does not make the seven findings otherwise mandated by Connecticut General Statutes § 17a-112 (e). The court has also heard the testimony of this child's foster mother who spoke with great sensitivity about Sarah Jean's specialized needs. Sarah Jean attempts, she stated, to cope with her increasing muscle weakness and her inability to easily walk up stairs. Her foster mother spoke of the efforts the family made CT Page 13087 to protect Sarah Jean from injury as she engages in ordinary activities that two-and-one-half year old children enjoy. From the testimony, the court finds that the devotion and dedication this foster family has shown to Sarah Jean is remarkable and moving. Without question, they have her best interests in mind and do everything in their power to care for her. This child has been with them since she was five days old and has become as much a part of their family as their older children. It is evident from the expressions of the foster mother that she cannot imagine a life without Sarah Jean. When asked if she and her husband were willing to adopt Sarah Jean, she replied without hesitation: "Absolutely."
Dr. Mantell noted that there was a close, warm relationship between the child and her foster mother. When evaluating them, he "observed the child relating most intensely to the foster mother and that all foster family members were extremely competent, comfortable, warm and supportive in their interactions with Sarah Jean.[2] He concluded that the foster family appeared to be the psychological family and the foster mother the parent of Sarah Jean at that time. The social workers also testified as to the relationship between the foster family and Sarah Jean. They saw and continue to see a strong and happy bond between the foster family and Sarah Jean. The court concludes, by the clear and convincing evidence, that the best interests of this child are served by terminating the parental rights of her father, Eugene S. and thereby freeing her for adoption.
Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re JuvenileAppeal (84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). In addition, "because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." Inre Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992). Sarah Jean has known no other home than that of her foster family, who is eager to have her join them permanently and legally. Permanence for this child is best achieved by permitting her foster care placement to become her permanent home.
Based upon the foregoing, the court finds that it is in the best interests of Sarah Jean that the rights of her biological parent to her be terminated. The court orders that a termination of parental rights enter with respect to Eugene S. The Commissioner of the Department of Children and Families is hereby appointed the child's statutory parent. Further, the court CT Page 13088 directs that the foster family with whom Sarah Jean resides be given first consideration to adopt this child. The court further orders that a permanency plan for her be submitted within ninety days. A review plan for her shall be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session