[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. PROCEDURAL HISTORY
The Department of Children and Families (DCF) filed a Motion for Order of Temporary Custody dated January 7, 1997, and the Court, acting by Levin, J. granted an ex parte order of temporary custody on January 7, 1997, vesting custody of the minor child, James F. with the D.C.F., until further order of the court. On said date the D.C.F. also filed a Neglect Petition alleging that the mother and alleged father of the minor child were denying said child proper care and attention, physically, educationally, emotionally and morally; and furthermore that said child is being permitted to live under conditions, circumstances or associations injurious to the well being of the child.
The mother and the alleged father of the child were summoned to appear on January 16, 1997, at 10:00 a.m. at the Superior Court Juvenile at Bridgeport, Connecticut for a show cause hearing on the Order of Temporary Custody in accordance with C.G.S. § 46B-129(B) as amended by Public Acts 1995, No. 95-238 Section 4.
On January 16, 1997, the mother and father appeared. The Court ordered that court-appointed counsel be assigned to the indigent mother, and that the father be allowed to apply for Court-appointed counsel. The court further ordered that the alleged father undergo a paternity test. The hearing was then continued to January 28, 1997 for the taking of evidence.
On January 21, 1997 the Court ordered that counsel be appointed for the alleged father. CT Page 1262
On January 28, 1997 at 2:00 p. m. the Court could not proceed with the contested O.T.C hearing as the interpreter for the hearing impaired-deaf, whose services were necessary for the mother, could not be present. It is noted that the mother of the minor child was present and ready to proceed, but the alleged father was not present. The hearing was continued by the Court until February 5, 1997 at 2:00 p. m.
On February 5, 1997 at 2:00 p. m. the taking of evidence and testimony commenced. The mother appeared and the alleged father did not. The minor child, mother, and alleged father were represented by counsel. The counsel for the alleged non custodial father did not appear. The petitioner D.C.F. was represented by the Assistant Attorney General. The hearing commenced February 5, 1997 and was continued for hearing on February 6, 1997 and on February 11, 1997. The hearing concluded on February 13, 1997. At each hearing date, the mother was present, and the alleged father was not present. Counsel for the alleged father did not appear at these contested hearing dates.
The petitioner, D.C.F. introduced the testimony of the following witnesses at trial:
1. Wanda Tidhar, MD.
2. Nadine Hassam, Nurse Practitioner
3. Mrs. W ___, Foster Mother of James F.
4. Mary Ann Townley, Social Worker D.C.F.
 5. Jennifer Barba, Social worker Bridgeport Hospital
 6. Suzanne Guerrucci, Greater Bridgeport Mental Health
7. Cathy M. Russell, D.C.F.
The respondent mother testified in her own behalf.
No evidence or testimony was introduced by counsel for the minor child, nor was any evidence or testimony introduced by the absent alleged father. CT Page 1263
All parties present were notified by the Court that testimony would be preserved for any future hearings on the neglect petition.
II. FINDINGS OF FACT
The Court having carefully considered the testimony of the witnesses, and the evidence adduced at the O.T.C. hearing, makes the following findings of fact.
On January 2, 1997, the mother Eunice F. gave birth to the minor child, James F. at the Bridgeport Hospital in Bridgeport, Connecticut.
Eunice F. is the mother of four other children, ranging in age from 21 years old to four years old. The three oldest children reside with members of their father's family. The youngest child is in foster care, the parental rights of the mother having been terminated in 1996.
Testimony was heard from Dr. Wanda Tidhar, that she has been treating the mother for approximately six years for psychiatric illnesses diagnosed as schizo-affective disorder and personality disorder for which the mother takes medication. Dr. Tidhar testified that Eunice F. is manic depressive resulting in mood swings which can be difficult to regulate. The mother is afflicted with periods of excessive anger, and a tendency to blame others for her difficulties. At times she has grandiose delusions and impaired judgment. She will walk away from difficult situations and will get angry and frustrated. She can become very argumentative and impulsive and sometimes disruptive. Eunice F. takes lithium to stabilize her moods, and also takes "Trilaform" (sic), a tranquilizer for stress. Stressful situations an exacerbate Eunice F. mental illness problems. Under stressful situations Eunice F. can become "hypomanic" a state of mind where her judgment becomes impaired, and her behavior can become frantic.
In addition to the medications previously noted, the mother, Eunice F. after some reluctance to do so, agreed to take "depocote" (sic), and has been complying with this request.
When residing at the Greater Bridgeport Mental Health Center, Eunice F.'s illness, could be monitored closely and her CT Page 1264 condition can be stabilized. However, Dr. Tidhar testified that without adequate supervision and assistance and the monitoring of Eunice F.'s medication the minor child could be at risk if custody was to be returned to the mother at this time. Dr. Tidhar did testify that Eunice F. had no history of physical violence, but rather her illness manifests itself in anger and argumentiveness which could cause her to divert her attention away from the needs of her infant child. Dr. Tidhar could not support releasing the minor child to the custody of the mother at this time. Eunice F. is at a baseline functioning level at this time, and maintains it with adequate and substantial support services. However it appears that Eunice F. is reluctant to agree to, and to cooperate with the support services being offered by the petitioner and various social agencies.
The Court heard testimony from Nadine Hassam, a nurse practitioner for the D.C.F. whose first encounter with the mother was at the hospital. She stated that the mother was very upset, upon being informed that the child James F, was being taken into custody by the D.C.F. . Her next contact with the mother was a home visit at the mother's residence on January 31, 1997. The minor child was present at this visit. The mother was happy to see the child. The mother's conduct in holding the child, changing the child's clothing; and feeding the child was appropriate. The Court finds Mrs. Hassam's criticism of the manner in which the mother heated the formula and fed the child, frivolous and unwarranted. Mrs. Hassam noted that the mother seemed to be easily distracted from her parenting duties, but that the mother did nothing to endanger the child's safety.
The foster mother testified that she received James F. into her care on January 6, 1997. The child is normal and healthy, and as with any other normal infant, the child needs constant monitoring, feeding and attention.
The Court discounts the testimony of Mary Ann Townley of the D.C.F. . Her knowledge of this matter was entirely based upon hearsay conversations with others, all of whom testified in person before this Court.
Additionally, the Court assigns little weight to the testimony of Jennifer Barba, social worker from the Bridgeport Hospital, as she also, had little first hand knowledge of the situation in this case. Her testimony was cloudy and ambiguous, CT Page 1265 other than her concern that the mother had no stable living arrangement, and that the mother had no supplies or furniture for the baby. She never personally reviewed Eunice F.'s medical records regarding any prior evidence of mental illness, nor did she choose to investigate further.
Cathy M. Russell of the D.C.F. testified solely for the purpose of stating her department's position and evaluation that James F. was at risk of harm, and that the department desired to retain temporary custody of the child.
Suzanne Guerrucci, Psychiatric Social Worker for the greater Bridgeport Mental Health Center testified that she started working with Eunice F. during Eunice F.'s pregnancy in October, 1996. She did review Eunice F.'s previous psychiatric history. It is noted that Eunice F. is hearing impaired and Mrs. Guerrucci, also is hearing impaired, and is therefore sensitive to this issue as it relates the mother's ability to care for an infant child. Ms. Guerrucci confirmed Dr. Tidhar's assessment that Eunice F. was not comfortable with interpersonal relationships and could become angry and argumentative when receiving advice and assistance from others, especially caseworkers and mental health professionals. The mother has periods of time when she is calm and in control of her moods with medication. However even with medications, stress can cause her to become agitated. Stresses included the loss of custody of James F., and the loss of relationships with the family and four prior children. It also included the frequent change in therapists at the Greater Bridgeport Mental Health Center due to staff changes. Ms. Guerrucci did concede that some of Eunice's anger and suspicions can be realistic given her past experiences with D.C.F., her relatives, and other medical personnel. Ms. Guerrucci noted that Eunice F. was receptive to being co-operative and following instructions; especially if Eunice F. thought it would help her in getting custody of James F., Eunice F. was compliant with her prenatal care and appears to be following instructions regarding the taking of her prescribed medications.
Mr. Guerrucci further testified that although she, herself, was not formally trained to evaluate a person's ability to parent a child, she believed that Eunice F. could care for the infant James F. if given adequate support services, counselling, and takes her medication. However when asked directly if she felt confident about Eunice F.'s ability, at this time, to care CT Page 1266 for James F., she could not "clearly" answer yes or no.
Ms. Guerrucci did testify that through the Priority Care program Eunice F. would receive the necessary equipment, alarms and monitors to overcome Eunice's being hearing impaired. However, if these items were not in place and functioning; or if not properly utilized by the mother, harm could result to James F. There is no reason that a hearing-impaired parent cannot successfully parent a child. While being hearing impaired is a relevant issue, it is separate from the question of mental illness. It is one factor to be considered in the entire evaluation of Eunice F.'s ability to parent a child.
It is found by the Court that the necessary services and equipment to deal with the hearing impaired issue could be installed in the mother's residence in a matter of days. Other assistance can involve a Home Health Care Aide for twenty hours per week; a Medical Nurse, as needed; and a Psychiatric Nurse, as needed. There is a question, however, of the degree to which Eunice F. will co-operate in utilizing the Priority Care program, especially in light of the mother's tendency to be argumentative and resistant to advice by others, and the fact that she has antipathy toward the D.C.F. and those she holds responsible for the loss of custody of James F. and the termination of parental rights with another young child. It is also noted that paranoia is a symptom of her mental health condition.
The court heard testimony from Eunice F. that a nervous breakdown and her husband's illness was the root cause of her not being able to care for her prior children. Subsequently the three oldest children were placed with her husband's relatives. Acrimony between Eunice F. and these relatives along with Eunice's mental condition and a feeling of helplessness to contest the situation led to a loss of frequent contact with these children. Subsequently as noted earlier her parental rights with the younger child were terminated based on a petition by the D.C.F. .
The Court finds that Eunice F. has lived alone at her present residence for approximately eight years. She has no telephone although one can be provided for her as part of the services being offered. Baby supplies and baby furniture were absent from the residence, but has since been supplied to the mother. CT Page 1267
Eunice F. testified that she is willing to co-operate with Priority Care services, but the Court is convinced that Eunice F. does not feel she needs these services, and only views these service interventions as something to be tolerated in an effort to regain custody of James F. . While Priority Care service can be available for as long as one year, Eunice F. has only agreed to accept them for 2 to 3 months. She feels she is totally capable of caring for James F. without them.
Eunice F. also expressed dissatisfaction with Suzanne Gerrucci's services although she agrees to keep working with Ms. Guerrucci. Eunice F. seems to feel betrayed by Ms. Guerrucci and is suspicious of Ms. Guerrucci and her perceived motives. These feelings of Eunice F. appear to be consistent with her behaviors and mood patterns which are indicative of her mental health illness.
ADJUDICATION
 (On Facts as of February 13, 1997)
The Court may issue an ex parte order of temporary custody in cases of an alleged neglected, abused or uncared for child upon an application supported by a sworn statement alleging such facts that support a finding of probable cause to believe that among other things, a child is in immediate danger from its surroundings and that immediate removal from those surroundings is necessary to ensure the child's safety. When orders of temporary custody are issued ex parte a court hearing is held within ten days of the issuance of the order to hear the sole issue of the continuing need for protective custody until a full hearing is held on the merits of the neglect petition. (C.G.S. § 46b-129 (b)).
Orders of temporary custody are intended to protect children during urgent situations where their physical health and safety are jeopardized. If the urgent situation no longer exists the order should be vacated, and custody of the child restored to the parent or guardian. In Re Juvenile Appeal (83-CD),189 Conn. 276 (1983).
The governing standard of proof at any Court hearing on temporary custody is a "fair preponderance of the evidence." The burden of proof rests with the petitioner D.C.F. in the CT Page 1268 present case.
Accordingly, the Court finds that the petitioner, Dept. of Children and Families has proved by a fair preponderance of the evidence that the minor child, James F. is in immediate physical danger from his surroundings should custody be returned to his mother Eunice F., and should be allowed to reside with his mother alone at her present residence.
While the Court feels that this situation could change in the future should Eunice F. co-operate with the support services being offered to her, the court is not presently convinced that Eunice F. is ready and willing to co-operate in accepting these services. The Court notes the mother's reluctance to accept these services, and an unwillingness to admit she needs these services.
The Court while concerned with the mother's hearing impairment, does not consider this condition alone as disqualification for present custody. The Court is cognizant that many persons with hearing impairments are qualified and successful parents, and are successful members of the professional vocations, as well as other means of employment. The judicial system and our state legislature has recognized this fact, and this Court welcomes the hearing impaired as jurors, as well as, witnesses and litigants.
However the Court cannot fail to notice that hearing impairment is a factor to consider; especially in light of the mother's mental impairment/illness. The Court is cognizant of the needs of a new born infant from listening to the testimony of the foster parent and the witnesses. The Court is also the parent of a young child. The Court finds that the combination of these factors causes James F. to be at risk if released to Eunice F. at this time.
Lastly the Court is optimistic that given the co-operation of the mother, and the installation of protective devices in the mother's residence, James F. and Eunice F. can be reunited in the not too distant future. The mother will need to avail herself of the services being provided, including the Home Health Aide. The Court would hope that the D.C.F. and the mother can present a plan wherein, if successfully implemented, and followed by the mother, can result in re-unification, prior to a hearing on the neglect petition. CT Page 1269
ORDER
Wherefore, it is the order of this Court that temporary custody of the minor child be granted to the Dept of Children and Families until further order of this Court.
Entered at Bridgeport Connecticut this 13th day of February 1997.
ARNOLD, JUDGE