MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Nora A. and Angel R., who are the biological parents of the minor child Anjelica A., born September 4, 1990. The court finds that the mother has appeared and has a court appointed attorney and that the father has been served by publication, initially in the Record Journal, a newspaper circulating in Meriden, Connecticut, and more recently by publication in a newspaper circulating in the City of New York, advising him of the court hearing of August 1, 1997 before the Child Protection Session of the Superior Court in Middletown, CT. The father has failed to appear. In addition the court file reflects attempts to serve Angel R. by personal service and registered mail in Connecticut and New York. The court finds that the child went into the care of the Department of Children and Families (DCF) with Angel R.'s knowledge, that he has not visited the child or contacted DCF, thus indicating a complete lack of concern or interest in her. The court finds that diligent efforts were made to ascertain the father's whereabouts and provide notice to him of these proceedings. These efforts included talking to his own mother, as well as to the mother of his children. The court has jurisdiction in this matter; there is no pending action affecting CT Page 8404 custody of the children in any other court and reasonable efforts have been made to reunify this family. The court specifically finds that the appointment of an attorney for the father, who has expressed not the least interest in his children, is wholly unnecessary.
The court having read the verified petitions, the social studies, and having heard the testimony of numerous DCF case workers, Dr. Nguyen-Tan, a police officer, psychiatrist Dr. Richard Sadler, the respondent Nora A., and various service providers, makes the following findings by clear and convincing evidence.
FACTUAL FINDINGS
The court finds the following relevant facts. Nora A. testified that she will be 29 years of age this month. She has two brothers and five sisters. She was raised by her mother in a single parent home. She did not know who her father was until she was 18 years of age when her mother was dying of cancer and told her the name of her father. Nora had dropped out of school in the ninth grade because she didn't like it, and because she wanted to hang around drinking beer and smoking cigarettes. She testified that she was raped at age 14 and had a child as a result at age 15. Her mother raised that child for about three years until her mother died of cancer. The child then lived with Nora for a short time until the mother was arrested for a drug related event. Nora said that when she was arrested and the DCF worker came to the police station she told DCF that her half-sister ". . . could have the kid because he was a rape kid." The sister subsequently obtained guardianship of Nora's first child.
Nora's second and third children, Vanessa and Mikol, were by Marcos G. Vanessa was born on November 5, 1986. Nora testified that she and Marcos would fight a lot. One day Marcos hit her while Vanessa was in her arms so Nora called DCF to take care of Vanessa. Nora remained with Marcos. She stated that she knew DCF wouldn't return the child if she stayed with Marcos because he was abusive. Nora's parental rights to this child were subsequently terminated.
Nora's third child, Mikol, was born on September 18, 1988. The Social Study (Petitioner's Exhibit # 11 A) indicates that this child was brought to the hospital with a broken leg when he was six to eight months old. Examination revealed untreated fractures and rat bites. Nora and Marcos were arrested. Nora CT Page 8405 testified Marcos had hit the child but ". . . I went to jail because they said I failed to protect Mikol." Nora's parental rights were terminated and Mikol has been adopted. Nora was convicted of Risk of Injury to a Minor and received a ten year suspended sentence in December, 1989.
Nora's fourth child, born in 1990, is Anjelica, the subject of this petition. The father is Angel R., who is the father of Nora's last three children. Lizette, her fifth child, was born on October 17, 1992 and was removed from the home of Angel and Nora as an Uncared for child on July 1, 1993. The pediatrician who had examined the child indicated that she would have died of starvation had she not been removed from the home. The parents' rights to this child were terminated in August, 1997 (Foley, J.).
Luis R. was born in 1994. He is currently in the care of the paternal grandparents. In her testimony, Nora said that she forgets about him because he was an unwanted pregnancy and she gave him away right away. None of the children born to Nora over the past 14 years are in her care and the only one with whom she has felt a parental bond, according to Nora, is Anjelica.
The parents of Anjelica, Nora and Angel, were unmarried and lived with each other in a completely dysfunctional setting. Their living arrangement included the presence of Rosemary R., Angel's other girlfriend and the mother of yet another child by Angel. That child of Rosemary and Angel is presently five years old. Nora testified that as of the date of the trial, Angel no longer lives with the two women, but that she and Rosemary continue to live together.
The intervention by DCF in 1993 involved both Anjelica and her younger sister Lizette, the two children of Nora and Angel, who were both living in the home. There had been several earlier interventions by DCF with this family. In home services had been provided.[2]
On July 1, 1993 a petition was filed in the court alleging that the two children were Neglected and Uncared for by the parents. The petition included allegations that the children had been denied reasonable necessities for life. The children had been inadequately fed or malnourished. Anjelica had weighed 27 pounds in October of 1992 at age two, and nine months later the child weighed only 26 pounds; the child wore rags for diapers. CT Page 8406 The father, Angel, told the DCF worker that the children had not been and were not his concern. Nora testified in court that she stopped having a relationship with Angel R. after he told the social worker ". . . that those weren't his kids and he didn't care what happened to them." Nora stated, "I didn't think it was fair . . . ." The court notes that she continued to live with Angel for a considerable time after this episode. Nora had not complied with previously required substance abuse counseling and was suicidal according to the petition. She refused offered treatment.
At the court hearing on July 27, 1993, it was determined that Lizette was to remain in DCF care but, for reasons not explained, Anjelica was permitted to return to the "care" of her mother under an order of Protective Supervision. Nora entered into a "Service Agreement" with DCF on July 27, 1993 (Petitioner's Exhibit # 5) in which she agreed not to involve herself in any criminal activity, not to use drugs or alcohol, to cooperate with the parent aide service and the visiting nurses association, not to leave the jurisdiction and to keep her pediatric visits. She violated all of these agreements.
Within eight weeks of signing the service agreement, DCF was notified by Nora's probation officer, Arlene Buckley, that Nora had tested positive for the presence of cocaine and that she had failed to comply with the terms of her drug program. Nora refused to allow the visiting nurse into her house. She refused to give DCF a urine sample. She told the social worker that Anjelica was no longer in Connecticut and that Anjelica was living in Florida.
The worker testified that Nora was not available when the worker went for home visits to Nora's last known address on Broad Street. Angel was there and told the worker and the police officer that he was not Anjelica's father; he would not allow them to enter and was very hostile. (Petitioner's Exhibit #6) The worker said that she checked without success a second address at Center Street where Nora's monthly checks were sent. Lastly, the worker checked the home of Angel's mother where the couple had been known to stay. The worker said she was not able to locate Nora or the child at any of those places.
Nora testified that she called DCF to arrange to see Lizette in August or September of 1993, but that the DCF worker wanted her to bring in Anjelica. Nora said that she knew she was being set up. She admitted the fact that she had been using cocaine in August of 1993, that she avoided DCF social workers, and that she CT Page 8407 was aware that she had violated her service agreement.
On December 7, 1993, Anjelica and Lizette, who had both been the subject of the Neglect/Uncared for petitions, were adjudicated as Uncared For Children at the Superior Court (Karen Sequino, J.). No expectations were set or approved by the court since Nora had not appeared for the hearing. The social worker thereafter filed a missing child report with the police department since the whereabouts of Anjelica remained unknown and the child was now legally in the custody of the Commissioner of DCF.
Nora testified that at that time, December, 1993, she decided she wasn't going to use drugs any more and that she was going to hide out with Anjelica. Her "hideout", according to Nora, was her regular place of residence where she continued to live until February, 1994. This was the same residence from which the children had been initially removed. She continued to live there with Rosemary, Rosemary's child and with Angel. The parents and children subsequently moved to the downtown area in the same city and then later to Hanover Road, all together. Nora said she didn't hide, that she was outside a lot and that she even saw police a lot: ". . . they knew me because of my police record." Whenever anyone asked her if Anjelica was her child, she denied it. She lied to DCF workers and to others. On one occasion, when a DCF worker went to her house with the police, the adults lied about the child. Nora and the child then left the home for four days because Nora feared the DCF worker would return.
For nearly three years Anjelica's whereabouts were unknown to DCF. The commitment of Anjelica to the care and custody of the Commissioner of DCF had expired and was not extended because the child's whereabouts were unknown to DCF. An unforseen development occurred in 1996.
On July 2, 1996, a 14 year old pregnant girl contacted DCF and said that her father was beating her and that she wished to return to her maternal relatives in New Jersey. She told the worker she lived with her father Angel R., and two women, Rosemary R. and Nora A., and two children, one by each woman. One of the children was Anjelica, although she was now called "Jackie" and her hair was cut short to look like a boy. The girl told the worker that Angel was now to be called "Jose", and that he also beat Anjelica as recently as that very morning.[3]
CT Page 8408
The DCF worker, accompanied by another worker and the police, went to the Hanover Road apartment. Rosemary R. answered the door. She denied that Angel, Nora and Anjelica lived in the house. After the police again questioned the 14 year old pregnant girl, who was in the police cruiser, they entered the house. After a complete search of the home they found Anjelica locked in a bathroom. The social worker testified that the child was completely dirty and skinny. She looked like a boy, her hair had been cut short with no style. When asked, Anjelica admitted to being hit by "Jose". The police officer testified that the bathroom door where Anjelica was found was locked and the door knob was missing. The officer was able to gain access by the use of a screwdriver and when he entered he found the small child with a blank expression. The child had visible bruises. She was brought to the hospital for evaluation.
At the hospital Anjelica was offered a sandwich which she carefully guarded and ate quickly. She was offered a second sandwich which she also quickly ate. She indicated to the worker that there was no food in the apartment, that all she had to eat was macaroni, that both her father and her mother had used handcuffs on her and that her father had hit her with a pipe causing a wound which he sewed up with a needle and thread.
The examining physician at the emergency room testified that the child indicated that she was hungry and sandwiches were offered to the child. The medical report from the hospital (Petitioner's Exhibit # 1) indicated a past medical history as follows:
 The patient has had multiple visits to the Emergency Department, in particular a visit on 6/28/93 with a chief complaint at that time of child abuse, as well as a visit on 3/17/92 in which the complaint at that time was also child abuse.
Anjelica presented with several bruises along the hairline. Nora could not explain them when she testified. There were several circular scars on Anjelica's right flank which were suggestive to the doctor of cigarette burns. Nora later said they were from an iron that accidentally touched Anjelica the previous February. The doctor testified that the scars did not have same lineal mark of a hot iron and that steam burns would not cause the coalescing circular scars which he observed. There was a horseshoe scar on her calf, a purplish-brown bruise on her shoulder, a linear scar on her triceps as CT Page 8409 well as several abrasions.
The court concludes from the doctor's testimony and the physical evidence that this child had suffered abusive treatment at the hands of her caretakers and, at the very least, Nora had failed to protect her child from abuse, if she did not in fact actively participate in that abuse.
POSSIBLE NON-ORGANIC FAILURE TO THRIVE — UNNOTICED
What is of great concern to the court is the failure of any DCF worker to identify and pursue the possibility of a serious life-threatening, pathological condition, a form of child neglect, known as non-organic failure to thrive.
 Non-organic failure to thrive in an infant represents a crisis situation. There are few more threatening circumstance for a baby. The mortality rate associated with nonorganic failure to thrive is difficult to assess exactly, as data are scarce and different studies are based upon different definitions of failure to thrive and whether the children died of failure to thrive, with failure to thrive but of some other cause, or having at on time had failure to thrive. Having had failure to thrive is associated with an increased risk of death from physical abuse (Oates et al, 1985). It is our clinical impression that failure to thrive is also associated with an increased incidence of accidents in the context of supervision neglect . . . .
 Non-organic failure to thrive is not simply a nutritional problem. It is a pervasive problem of the parents' lacking empathy for the infant. Consequently, they are unable to perceive correctly their child's signals and are sometimes frankly hostile to the baby. The poor care is usually founded in the parents' own neglected childhood. Non-organic failure to thrive cannot be corrected by instruction alone.
 Bailliere's Clinical Pediatrics, The Consequences of neglect-individual and societal, Donna Rosenberg and Hendrika Cantwell, Vol 1, No 1, February 1993.
In the first petition filed in this case on July 1, 1993, the caseworker claimed:
The child has been deprived of basic necessities. Child does not CT Page 8410 have shoes. Father and mother have not had food to feed the child. Child is forced to wear rags for pampers. Child's growth and development is impeded due to nutritional intake. Child weighed 27 lbs. in October 1992. Child presently weighs 26 lbs. Her weight is in the 10th percentile. Her weight is under average. Father has stated said child has not been, and is not his concern. Mother is verbalizing suicidal ideations, refused treatment when offered. Mother has not complied with substance abuse treatment as directed by the court.
Notwithstanding these allegations, the child was returned to the mother at the plea hearing, and the mother, as earlier noted, went into hiding with the child and never returned to court. When the child was found three years later and was examined by the emergency room physician, in addition to bruises, abrasions and scars, the doctor found Kwashiorkor syndrome. The doctor described this as a clinical observation characterized by an abdominal protuberance and distention which is suggestive of malnourishment. It is exclusively a malnourishment syndrome. It is secondary to an absence of protein. It is common in third world countries where people eat exclusively rice or tortillas and there is no protein in their diet. As earlier noted, when Anjelica presented to the hospital staff she was hungry and told the authorities that she just ate macaroni. The police officer testified that the child had a "blank expression" when found.
These facts certainly suggest the possibility of non-organic failure to thrive which should have alerted both the physician and the DCF worker of the need to obtain a competent pediatric/medical evaluation of the child. The importance of this diagnosis cannot be overstated. First, the diagnosis would indicate life threatening nutritional deprivation to the child, and would further suggest risks to the child in the form of other types of abuse and neglect. Second, the evaluation by a pediatrician would determine if the child's condition was caused by organic problems which might be corrected medically or surgically. The pediatrician could also determine if the condition were caused by feeding errors of the parents, although the facts of this case do not suggest these situations. Lastly, the diagnosis would assist the caseworker in preparing expectations or service agreements that provided for services to the family that were adequate, available, accessible and relevant. This is very important since this form of neglect is usually not caused by an economic or informational deficit of the parents. CT Page 8411
MOTHER AND CHILD
Anjelica was born on September 4, 1990. When the child was five months old, her mother was incarcerated and the child lived with the paternal grandmother. When Angelica was two Nora was again incarcerated and Anjelica lived with her aunt Mary who obtained temporary legal custody through a probate proceeding. When Nora was released from jail she had conflicts with the aunt who then turned the child over to DCF. In October, 1992, Anjelica was returned to her mother pursuant to a probate court order. Nine months later Nora contacted DCF to report she had no food or formula for her two small children, Lizette and Anjelica. An order of temporary custody was obtained on June 28, 1993. On July 28, 1993 the child was returned to Nora who then disappeared for three years.
Nora has an impressive arrest and conviction record for larceny, assault, risk of injury and harassment charges. She has been sentenced and incarcerated at least five times. It is likely that all of these criminal charges are incidental to her drug addiction.
Nora was interviewed and evaluated by a court appointed psychiatrist. The doctor evaluated her alone and with Anjelica. While Nora conducted herself in a casual, comfortable, organized and emotionally connected but deceitful manner, Dr Sadler concluded that ". . . [Nora] is an unreliable historian who intentionally, skillfully, planfully and at times successfully misrepresented her own thoughts, activities, intentions and her participation in the abuse and neglect of her children . . . . [Nora] has chosen to not care for her child and she has actively, persistently and successfully resisted efforts to address her own criminal activities, her drug use and her repeated supervision of the neglect and abuse of her children."
Dr. Sadler concluded that Nora was a sociopathic personality disordered woman who had failed to minimally adequately care for any of her six children, ". . . it is my recommendation that [Nora] is not an appropriate caretaker for this child, is not expected to become an appropriate caretaker in the future, and that plans should be made that would allow for other adults to provide the needed care, structure and emotional nurturance for Anjelica."
The court concludes that Nora is also a very manipulative CT Page 8412 women. Having had six children over fourteen years she has not successfully parented and has resisted all forms of recommended therapy and services — until now. With the case for termination of her parental rights pending and a court date assigned for trial, Nora enrolled in an Outpatient Substance Abuse Education Group on May 19, 1997. Nora went to 16 sessions even though the program involved only 12 classes. In August 1997, last month, she entered a parenting class of four sessions for 1 1/2 hours each session. She attended all four sessions. The court concludes that given her history, the timing of her efforts and the superficiality of her attendance at these courses, the efforts were far too little and very much too late. The court notes that Nora maintains that she has been substance free since 1993 but, given her lack of treatment and urinalysis, and her history of deceitfulness to DCF and to Dr. Sadler, the court places little credence in this representation.
The father, Angel R., is presently thirty-three years of age. The social study has limited information regarding his background since he failed to cooperate with the social worker. He has never made himself available for the delivery of social services nor has he requested visitation with his children. This court finds that the father took no action to maintain a relationship with his children; he did not visit them; he did not communicate with them; he did not provide guidance; he did not express concern. With respect to Anjelica, the social study and the testimony lead the court to conclude by clear and convincing evidence that Angel R. abused and neglected Anjelica.
ADJUDICATION
With respect to the statutory grounds for termination of parental rights, the court finds, by clear and convincing evidence, that Angel R. and Nora A. have committed acts of omission and commission in violation of General Statutes §17a-112 (c)(3)(C) in that the child has been denied the care guidance or control necessary for the child's physical, educational, moral or emotional well being. The court further finds that the child has previously been adjudicated neglected and the mother and father have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parents could assume a responsible position in the life of the child, General Statutes 17a-112 (c)(3)(B), and that these grounds have existed for over one year. CT Page 8413
With respect to the mandatory factual findings required by General Statutes § 17a-112 (e):
1) The timeliness, nature and extent of services offered. The court finds that DCF was unable to provide services to Angel due to his complete lack of concern and interest in his children. Nora resisted offered services and effectively hid from DCF for three years.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Children Welfare Act of 1980. No efforts were made to reunite Angel since he has not made his whereabouts unknown to DCF or to his immediate family and accordingly, he was not available for the delivery of reunification services. The record is clear that DCF attempted to deliver services to Nora from shortly after the birth of Anjelica. DCF even allowed Anjelica to stay with her mother in the face of very condemning factors.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. Angel R. was not available for the preparation of service agreements, expectations or evaluations. Nora violated her service agreement and was not available for the preparation of expectations.
4) The feelings and emotional ties of the child with respect to the parents and foster parents, etc. With respect to Anjelica and the respondent father, the father has had no contact with Anjelica since her commitment. There are no emotional bonds to be broken as none exist. While Nora has maintained visitation with Anjelica it is an unproductive venture for Anjelica. She is weekly placed in a posture of divided loyalty. She feels comfortable and safe in her present home and calls her foster mother "Mommy". She is required by DCF to visit with this other "Mommy" who is a potential threat to her present stability. Anjelica needs to be placed in a home that is secure, nurturing, stimulating and safe for the indefinite future. Her mother cannot offer that.
5) As to the age of the child. Anjelica is 7 years of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In reJuvenile Appeal (84-CD), 189 Conn. 276 (1983). The Appellate CT Page 8414 Court has also correctly noted,"[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD, 99 (1979).
6) The efforts the parents have made to adjust their circumstances or conditions. The father Angel R. has made no known effort. Nora's efforts have been described.
7) The court finds that there has been nothing to prevent the parents from maintaining a meaningful relationship with the child. There was no unreasonable conduct noted by DCF. Visitation for mother has regularly been provided.
DISPOSITION
Based upon the foregoing findings, the court determines that it is in the child's best interest for a termination of parental rights to enter with respect to the mother Nora A. and the male biological parent Angel R. and, accordingly, a termination of their parental rights is ordered with respect to their rights in the minor child Anjelica A. The Commissioner of DCF is appointed statutory parent for Anjelica for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court, no later than 90 days following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by State and federal law.
Francis J. Foley, III Presiding Judge Child Protection Session