MEMORANDUM OF DECISION
On January 22, 1998, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Edward and Karen G. to their five children, who are now ages thirteen, ten, seven and one-half, six and one half and two and one-half respectively. The four oldest children came into the care of DCF after numerous referrals alleging physical, emotional and sexual abuse, lack of supervision, unsanitary living conditions, homelessness, medical, educational CT Page 9058 and dental neglect and violation of the child labor laws by having the children deliver newspapers in the early morning hours. The referrals began in 1989 and over the next five years, a total of twenty-eight were made, many of which were substantiated. By 1994, relatives filed for temporary custody in the East Hartford Probate court and on December 26, 1994, neglect petitions were filed by DCF as to the four oldest children. By the end of the summer in 1995, all the children were in foster care. On September 13, 1995, all four were adjudicated neglected and were committed to the Commissioner of DCF. The youngest, Edward, was born in November of 1995. He was removed from his parents in August of 1996, when he was nine months old. By April of 1997, he too was committed to DCF after a neglect adjudication. The full extent of the parents' mistreatment of the children and the regimen of terror and fear imposed by their father to never tell anyone about the physical and sexual abuse in the household would not emerge until several years later during the course of the treatment of the children. By then, the damage done to the children reflected by their various specialized needs and behavioral problems had become excruciatingly evident. And three years after the children's removal, at the time of trial, both parents were incarcerated, awaiting trial on multiple charges of risk of injury to a minor and sexual abuse of the children.
The court finds that both parents were personally served with the petitions for termination and have appeared through court appointed counsel. The court finds that proper notice has been given all parties in accordance with the law. The court has jurisdiction in this matter and further finds that there is no pending action affecting custody of the five children in any other court.
On June 11, 1998, the father, Edward G. appeared in court and consented to the termination of his parental rights. The court found his consent to have been knowingly and voluntarily made with the advice and assistance of competent counsel and with a full understanding of the legal consequences of his act. The court accepted his consent and the petitions were amended to reflect the consent and the non-consensual grounds withdrawn.
At trial, DCF proceeded against Karen G. on the grounds that the children had previously been adjudicated neglected and that she has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, CT Page 9059 considering the age and needs of the children, she could assume a responsible position in their lives. The second ground alleged against her was that the children have been denied, by reason of an act of parental commission or omission, the care, guidance or control necessary for their physical, educational, or emotional well-being. Connecticut General Statutes § 17a-112 (c)(3)(B) and (C).
The court heard four days of testimony from the primary case worker, several foster parents, Dr. Robert Meier, the court appointed psychologist, and several social workers and therapists evaluating and treating the children as well as three counselors who had worked with the mother, Karen G. In addition, twenty-one exhibits were introduced into evidence. The court took judicial notice of the prior record in these matters concerning these children. Karen G. attended the trial and, through her counsel, vigorously contested the petition. The court makes the following findings of fact, based on the evidence and the reasonable inferences from that evidence.
 1. FACTS A. Events leading to the removal of all five children:
The parents of these children were married in December of 1984 and by October of 1989, their first three children had been born. Karen G. was employed prior to her marriage and Edward held various positions through the years as a custodian, newspaper deliverer and courier. Although she later discounted and denied it, domestic violence was part of their relationship. In 1989, Karen secured a protective order following domestic violence by Edward and he was out of the home for a short period of time. By 1992, various financial problems began to plague the family. They owned a house together with Edward's mother, but a foreclosure forced a move into an apartment which they could not afford. Edward's sister testified that Edward misused her and his mother's credit cards and did not pay his share of the mortgage, although the DCF record reflects he denied these actions.
By the summer of 1994, the family's financial circumstances had deteriorated to the point the family lived in a tent and the parents began to deliver newspapers for the Hartford Courant. By the end of the summer, they moved in with Edward's mother for a short period of time in a very small apartment. The children were not enrolled in school. The relationship between Edward's mother CT Page 9060 and Edward was strained and in October, 1994, the police were called concerning a domestic dispute. Also a referral was made to DCF alleging the children were helping their parents deliver the papers as early as three a.m. in the morning. The police observed this and in early October, the grandmother and Edward's sister, Emma R., applied to the East Hartford Probate Court for an order of temporary custody of the children. On October 14, 1994, all four children were placed in foster care. Shortly thereafter, Edward and Karen G. rented a one-room efficiency unit at a motel. On November 9, 1994, the Probate court order was revoked. The two oldest girls, Sarah and Jennifer were voluntarily placed in DCF custody by their parents and Melissa and Daniel returned to their parents on that date.
During the next several months, suitable quarters for the family were not located by the parents. Various reasons were given, including the need to have funds for court expenses. Edward's lack of cooperation with DCF and hostility toward the foster parents began to surface, so much so that Sarah and Jennifer had to be moved to a new foster home. The father's hostility to all in authority attempting to provide assistance to him and to his family was apparent throughout DCF's involvement with the family and hampered its ability to assist the parents and to provide services to them.
While in the foster home placement, DCF began to receive the first reports that the girls were exhibiting sexualized behaviors towards each other. Nonetheless, when the voluntary placement agreement with DCF for Sarah and Jennifer expired in February of 1995, their father angrily refused to sign an extension. Both girls were then returned to the one room motel unit where their parents and two younger children resided. It was a period of time when the reunification of families was the thrust of DCF planning and this family unfortunately was no exception to the rule. For the children, it provided more opportunity for their parents to continue to physically and sexually abuse them.
The six family members lived in one room from February until June of 1995, during which time numerous referrals were made concerning lack of supervision of the children, inappropriate discipline as well as sexual activity of Sarah with another child there. Because of the lack of cooperation with DCF and the services then being offered, DFC secured an ex-parte restraining order and mandatory injunction on February 15, 1995, that the parents abide by the court expectations and agreements under CT Page 9061 which the children were returned to them. The order provides an outline of the concerns which DCF had about Karen and Edward and their parenting of their children. Specifically the parents were not to allow the children to labor or work in the morning before school including the delivery of newspapers; they were not to leave the children unattended, nor to physically punish them. They were to make sure the children attended school unless they had a valid medical reason not to do so which was documented by a doctor or nurse, to take them to the pediatrician, update their immunizations, test Melissa's hearing, secure family and individual therapy and take the children to sessions. They were to maintain a safe and adequate residence in a habitable condition, heated and up to health code standards and to cooperate with announced and unannounced visits by DCF and to provide reasonable access to the children.
Cooperation with DCF was only sporadic and in July of 1995, an order of temporary custody was issued from the bench (Lavine, J.) for Melissa and Daniel and then for Sarah and Jennifer a week later. Neither of the parents had complied with the terms of the restraining order and mandatory injunction and the home life for the children was intolerable. The four children never again were returned to their parents, although DCF's plan for reunification of the parents with their children remained unchanged until January of 1998, when the termination petitions were filed. Visitation of all children with the parents continued. It was expanded in the spring of 1996 with a treatment plan formulated in June to return the children home in August of 1996, a plan doomed to failure.
Kathleen Kolpinski, the primary caseworker from 1995 to May of 1998, testified in great detail to the problems the family exhibited in 1996. The decision had been made, she stated, to leave Edward with his mother and father after his birth in November of 1995 in the hopes that Karen and Edward could care for one child, when not overwhelmed with the four others, and could begin to rehabilitate. Her sadness at the result, the parents' ultimate failure to properly care for even one young child, was evident. She stated that there were concerns about Edward's development, but that his mother did regularly take him to the pediatrician. In July, 1996, during a home visit she noticed that the baby was in an infant seat, the back of his head was flat and the hair worn thin, as if he had remained there most of the time. He could not sit up, he did not crawl and he avoided eye contact. He would not reach for a toy when it was offered to CT Page 9062 him and was huddled in a fetal position. At that time, she offered Karen and Edward "Birth to Three" services for the baby, which they refused, insisting that the child was fine. They claimed he was crawling and had no developmental difficulties. She discovered from one of the neighbors that Edward and Karen G. were rarely at the house they had located and were on the road most of the time, engaged in a courier service. The baby was in the car with them for long periods of time, in violation of the court orders and expectations.
During a home visit in August of 1996, when the date for reunification of the four other children with their parents was only two weeks away, the full extent of the failure of Karen and Edward G. to prepare to reunite with their four children was visible. Ms. Kolpinski testified that the home was "in shambles". The baby was in a crib with a bare mattress in a soiled diaper and the smell of stale urine was in the air. A *** popsicle stick was next to him, a cord from a Venetian blind was in the crib and she saw a baby bottle with spoiled milk dripping on the floor. There were dishes of food in several of the rooms and six or seven bottles of baby formula all over the place. In the kitchen, there were dirty dishes everywhere and pills under the table. There were cords hanging down from the television so that the baby could pull the television over on himself; as she knew he was often in a walker when the parents were home. There were no safety covers on the electrical outlets, she said, despite the fact that she had talked to the parents about this. On the stairs going upstairs, the bannister was missing and nails were jutting out in several places three or four inches. She testified she could not believe "how horrible" it was. In one bedroom, there were so many clothes and so much debris, she could not see the floor.
During the months prior to her visit, the parents had been in therapy and parenting classes and Ms. Kolpinski had reviewed household safety issues with them on many occasions. They were both aware of the court expectations and the reunification plan. She stated it was apparent that neither of them had benefited from the services offered. When Karen was questioned about the condition of the home, her explanation was that the four other children had been for a weekend visit and she had not had a chance to clean the house. When the baby's state was pointed out to her, she picked him up to finally change him. When she did so, Ms. Kolpinski saw that he had a terrible bleeding rash. Karen stated she had cream for his condition. CT Page 9063
Ms. Kolpinski testified that after that visit she knew it was not safe to return Sarah, Jennifer, Melissa or Daniel to this home and also not safe for Edward Jr. to remain there. On August 19, 1996, she and a social services assistant visited once again. At that time she talked again to the parents about the condition of the home and the various things that were unacceptable. Mr. G. got very angry and was verbally intimidating when she was pointing out her safety concerns. He called her a "fascist pig" and accused her of keeping the children away from them. On August 22, 1996, a ninety-six hour hold was invoked, after a DCF investigator became involved, and Edward, Jr. was removed from the home.
 B. Evaluation results
The parents and the children were evaluated on several occasions by Dr. Robert Meier, the court appointed psychologist, whose reports were exhibits before the court.[2] Initially, Dr. Meier was optimistic that the parents could learn to be more appropriate and effective and made certain detailed recommendations for their rehabilitation. By 1997, he was more negative about the general prospects for the family. He noted that they were resistant to services, that the father was the dominant figure in the family and that despite many interventions, there was little or no understanding of the problems facing them or the children. Dr. Meier was concerned about the sexual abuse allegations then made by Melissa and Daniel and felt more investigation was needed.
Dr. Meier had seen the mother and the children more recently in 1998, just prior to the trial and testified about his recent observations. He stated that there are many emotional and psychological issues that she had not dealt with, that are very deep seated. He stated that "her defense system that had developed was causing her significant difficulty in her ability to accurately perceive situations. There is a pattern of distortion and denial that led to the serious abuse of the children over a long period of time." Dr. Meier also saw a lack of emotion and emotional involvement in her. He stated it would take at least one year to one and a half years of intensive therapy before the mother could deal with her own feelings, which influenced the ways in which she presented things to the children. His time estimate did not address how long therapy would be needed for her to deal with the issues relating to the children. He stated CT Page 9064 that the children simply could not wait that long for her rehabilitation. His opinion was that time was very critical for the four oldest children in terms of their own rehabilitation. He stated that the children all exhibited behaviors and traits of children who were traumatized before being removed from their home. He saw no increase in their mother's empathy for them and no ability to parent them. Dr. Meier found her understanding of the effect of trauma and the degree of disturbance in the children is very limited. He stated she could not adequately parent them. Even if she only had Edward, she could not adequately parent him or indeed any child. There was no system of supports he could envision that would enable her to provide adequate care for any child.
Respondent mother called several witnesses to testify about her course of therapy since the removal of the children. While each felt she was making some progress while in their care, all therapy terminated at the time of her incarceration in the summer of 1997. None had seen her with her children nor could provide the court with any information about the relationships, except as Karen G. perceived them. Catherine Ellenwood, of the Pastoral Counseling Center in West Hartford testified that Karen did accept responsibility for the physical abuse of the children by their father, but denied any sexual abuse or neglect of them. A counselor from York Correctional Facility testified to Karen's attendance at a program there for sexual offenders which consisted partly of classroom instruction and partly of group sessions. She stated that Karen appeared to have understood, as a result of some of the information provided, that there were signs Edward G. was sexually abusing the children.
 C. The Disclosures:
The full extent of the abuse inflicted upon the four oldest children was not known to DCF even at the time that Edward, Jr. was removed. Edward G. had so terrorized his children and instilled so strong a prohibition in them against talking about the home conditions to others that for the two oldest children, Sarah and Jennifer, it would take several years and the incarceration of the parents for them to be able to talk about their home life. While sexual abuse had been suspected by those involved with the children, it was not confirmed until after all the children were taken out of the home.
 1. Melissa and Daniel
CT Page 9065
The disclosures began with Daniel, the youngest child then in placement in the summer of 1996, just as DCF was in the process of removing Edward, Jr. from the home. Daniel's foster father testified that at that time, Daniel was very quiet and he asked him if anything was wrong. He also asked him, as he was aware of DCF concerns about sexual abuse, whether anyone had touched him. He testified that Daniel told him his sisters Sarah and Jennifer had touched him and had "even kissed it". The child then said nothing more during further discussions. Melissa, however, who was also placed with this same family, overheard Daniel and became very upset. She started to yell and went running off. She said "Daddy is going to be mad. You are going to get them in trouble."
Melissa, when placed in foster care, had constant problems with wetting and soiling herself, which continue to this day. She also engaged in self-injurious behaviors, such as running the shower so hot she would scald herself. After Daniel's disclosure, the next day Melissa began to talk about things that happened while she was home with her parents. She was disturbed about the things that her parents had done to her and was jumping from story to story. She talked about when she went home, her mom and dad had touched her in her private area. Melissa said "Mom and Dad do not want us talking. He (Daniel) will get us in trouble and if Kathy (Kolpinski) finds out, we will never go home."
In the year prior to this disclosure, Melissa was seen by a therapist at North Central Counseling Services, who worked in the area of sexual abuse disclosures and treatment of children who have been sexually abused. Joan Prior testified that Melissa made no specific disclosures to her, but that there was reason to believe that she had been sexually abused. However, a year later after her disclosure to the foster mother, Melissa saw Kim Herwerth of the Sexual Assault Crisis Center in September of 1996 until January of 1997. Ms. Herwerth testified that she had five sessions with Melissa. She stated that the child was very guarded at first. Initially, the child stated that everything was the "court's fault, that she missed her parents and wanted to go home." During the fall, her behavior in her foster home was deteriorating. She was very aggressive and physically abusive to her brother Daniel. She was throwing things, hitting and verbally abusive to other children. She was defecating and urinating on herself. On December 27, 1996, Ms. Herwerth testified, she received a hot line crisis call from Melissa who was very CT Page 9066 emotional and upset. Ms. Herwerth stated the child's voice was shaky and very emotional. Melissa stated she was keeping all these things in her head and "if I do not let them out, they bother me." Melissa then made detailed disclosures about sexual abuse by her parents. She stated that her mother and father licked her "private", which she later clarified as her vaginal area. She said that both her parents told her if she told this to anyone, she could not come home. She said both her mother and father put their privates on top of her. She said her parents told her "they did these things to her because they loved her." She said she witnessed her parents having sex — and they told her the word "sex" and said "this is what it is."
Ms. Herwerth said that Melissa repeated this information in a face-to-face interview during which she covered up her face and curled up in a fetal position. Melissa was very embarrassed. The child was very consistent and very credible, Ms. Herwerth believed. Ms. Herwerth testified it was like a cork came off and Melissa exploded with this information. It was, she testified, the "child's worst nightmare coming true. She loved her parents, wanted to be with them, but did not like what was happening." She stated these are common emotions for children who want the abuse to stop, but also want desperately to be with their family. Her statement was prophetic about the terrible conflicts and pain the older children would find themselves in when they, too, began to disclose what had happened to them in their parents' home.
Melissa made the same disclosure to Kathy Kolpsinki when she came to the foster home on December 23 with Christmas presents. Ms. Kolpinski testified she expected to be there for a short time, but Melissa told her her parents had touched her private parts and before it was with other people and not to her. She said her Daddy put his private part on her private part and then she said "on her behind." Just then, Ms. Kolpinski testified, Daniel ran through the room and the child became uncomfortable and said no more. Later during the holiday period, she had an urgent phone message from her. The child was angry she could not reach her and said that she forgot to tell her something the week before. She stated that her father had licked her private parts and that her older sisters, Sarah and Jennifer did it too — Sarah did it to Jennifer.
Melissa continued to be very angry with her brother for making the initial disclosure and to strike out at him. She was hospitalized in March of 1997 and discharged in April, Ms. CT Page 9067 Kolpinski testified. She was diagnosed with depression, post traumatic stress disorder and enuresis for which she was placed on medication. Because of her situation and her continuing anger at her younger brother she was not returned to the foster home in which he continues to reside.
At present, Melissa is in a foster home which is providing for her needs, including her continued wetting and soiling problems. She also has herpes simplex, as do the other two girls. She continues to be difficult to manage and suffers from depression. Melissa has a great fear of her mother and father, Ms. Kolpinski reported. She is glad that they are far away. She is concerned about what is going to happen to them, "but worried about the fact that they will come and touch her and hurt her." Melissa continues to be untrusting of adults and her sisters, of whom she stated "When are they going to tell the truth?"
Unfortunately, the foster home where Melissa now resides is not a permanent placement for her. Melissa's emotional diffidence makes bonding difficult, Ms. Kolpinski stated. She has suffered a great deal of trauma and it will take many years of therapy to address those issues. It is hard to get through to her that she is safe and that the adults around her can be trusted. Nonetheless, Ms. Kolpinski stated that permanency is crucial for this child as "the longer she is in limbo, these ideas that she will never have a family will set in her head." Ms. Kolpinski stated that Melissa is adoptable and that she needs to be where she will know that she will be safe and nurtured with consistent parenting.
Daniel continues to reside in the foster home in which he and Melissa were placed in 1995. When he was first placed, he was sad and quiet. He is now an active and normal boy and has many friends. He is doing well there and has made progress. He is the child who was in the home the least amount of time and appears to have suffered the least trauma. He enjoys sibling visits with his sister, Melissa, although he continues to be wary of her. He, too, is in need of permanency and his present foster home may well be a permanent home for him, although his foster parents testified that they had not discussed adoption in any detail. They are attached to him and he to them. He rarely speaks of or asks about either of his parents any more, his foster father testified.
 2. Sarah and Jennifer:
CT Page 9068
The two oldest children have also exhibited the consequences of the abuse they suffered and, like their younger siblings, have highly specialized needs. Jennifer was seen by a therapist when she was first placed in foster care. She was treated from October of 1995 to August of 1997 by Debbie Avedian of United Services, who testified at trial. She testified that the child was "withdrawn, depressed, scared a lot." During her contact with her, Jennifer was wetting the bed, biting her nails very badly, and engaging in other self-destructive behaviors including biting the inside of her mouth until it was very inflamed and sore. She testified that this was a special needs child who had a hard time taking care of herself and assuming responsibility for her things. Her conclusion was that the child was traumatized. She stated that the child talked about secrets she could not tell. It was apparent that the primary rule in the family was not to talk about the family and the grandmother to DFC or anyone and that the parents laid down those rules. Jennifer spoke in therapy about her father yelling and hitting the children, including being hit herself. She had a worry and deep concern about her mother. When she knew of the birth of her baby brother Edward, she was worried about the baby and her mother and whether the baby was being taken care of. Ms. Avedian testified that her behaviors were consistent with the behaviors and traits of a child who was the victim of sexual abuse. She was unequivocal in her opinion that the child had been traumatized and needed permanence.
When Melissa made her disclosures in 1996 and the parents were arrested, Ms. Avedian testified that she and Ms. Kolpinski told both Jennifer and Sarah in a joint meeting about the arrest. The children were tearful and upset. Their responses ranged from a denial that their parents could have done this to statements that "I did not know about this." Ms. Kolpinski also testified that from time to time in the fall of 1996, she spoke to Jennifer about the abuse. On several occasions, the child told her she had a secret she could not tell. She did speak to Ms. Kolpinski about severe physical punishment by her father while at the motel. Also at one point she was made to stand in the shower in a bucket and she still had nightmares about it. She was disciplined for not cleaning the room properly and she reported that once, she refused to go for a visit because she was afraid she was going to be hit.
In the fall of 1997, Jennifer and Sarah came to live in the CT Page 9069 home of their aunt, Emma R., in New Jersey where they both presently reside. Jennifer, Emma R. testified, made a good transition. She began to excel in school at cheerleading and her performance academically improved. She was relieved that others at the school did not know that her parents were in jail. She has become very attached to her aunt and uncle and wants to be adopted by them.
In the fall of 1997, as a result of a suggestion by a crisis hot line worker, Emma suggested the girls write down the bad things that happened to them, that they would burn those letters and send those things to the angels. The girls did this and after consultation with DCF, the letters were forwarded to DCF and became exhibits before the court. While some of the words in Jennifer's letter are open to different interpretations, other sentences are legible and state with clarity the abuse Jennifer would later confirm to others. She wrote, among other things "#2. Dad said not to tell anyone." "I didn't like it when Dad het us because it hert." "I didn't like when Dad het all of us. I was mad when Dad het Missy and Danny and Sarah (illegible)." Sarah's letter is also touching and poignant for it is bordered on both sides with many repetitions in the margin of "don't remember", repeated again and again. She wrote in part "it was just my Dad, not my mother. Dad said not to tell. Mom didn't do anything but she let my Dad do it to us kids." While counsel for the children believed that introduction of the letters was in violation of the children' s confidence, testimony and a report of an evaluation of Jennifer[3] made it apparent that the girls were both aware that the letters were shared with others.
After the letter writing, Jennifer then began to disclose the inappropriate sexual contact by her father that Melissa had also described. The process seems to have permitted Jennifer to open up in an evaluation performed early 1998 when she confided to the evaluator that her father had touched her on her "private." She reported the various conversations between the siblings about "telling" and "not telling" The evaluator concluded that there was a high likelihood of inappropriate physical and sexual contact between Jennifer and her father. She found Jennifer credible due to her disclosure of the events in developmentally and affectively appropriate ways. She concluded that the idiosyncratic detail about related events and spontaneous descriptions empathized the authenticity of her disclosures.
Sarah, as the oldest child, had additional burdens. She was a CT Page 9070 parentified child, Ms. Kolpinski testified. She, too, had problems with enuresis. She was strongly aligned with her father and was expected to feed the other children, get them ready for school and in general do many of the things a wife and mother would do, including things like arranging for car repairs and making appointments. Ms. Kolpinski testified she believed Sarah took on the role of a wife to her father. Sarah perceived herself as protecting the other children and her mother from their father. When she drew a family picture, she drew herself in between her mother and father and the other children to one side.
She had a difficult time adjusting to life with her aunt as she could not trust her. For the longest time she was not permitted by her father to talk about her aunt Emma, as her father told her Emma's interference with the family caused the children's placement in foster care. In the late fall of 1997, Sarah was in difficult emotional straits and had written a suicide note. Her aunt was taking measures to prevent her from exercising so much control over her younger sister and Sarah began to act out in ways the family could not control.
She returned to Connecticut where DCF placed her in a temporary shelter, a placement which unfortunately lasted five months. During that time, DFC searched for a therapeutic foster home for Sarah, but was unable to locate one. Sarah remained in contact with Emma and her family and her other siblings. She frequently spoke to Ms. Kolpinski and by May of 1998, requested a return to her aunt's house, where she is presently doing well. Ms. Kolpinski reported that Sarah has had a genuine change in attitude and is able to act in more age-appropriate ways toward her sister. Ms. Kolpinski believes that with her parents in jail, the threat of her father's control and intimidation not present — Sarah has stated she "is relieved her father could not leave and come and get her." She, too, would like to stay with her aunt and uncle and appears now to have adjusted to life there.
 3.Edward G., Jr.
When Edward, Jr. was placed in foster care, he was nine months old and significantly developmentally delayed. His foster mother testified that when he came he had a terrible diaper rash, a rash on his stomach and sores in his mouth. He could not sit up or creep. "He just lay there". She stated that he had a blank look on his face and made no eye contact. "When you looked at him", she said, "he looked away." He showed no emotion. CT Page 9071
She stated that she worked with the child, made a game out of crawling and slowly he began to interact and make progress. She stated while there are still areas to work on, now he is a happy little boy. While she and her husband have other foster children and have adopted one such child, they do not plan to adopt Eddie. Nonetheless, Ms. Kolpinski testified that Eddie is adoptable and that she knows that Emma R. would like to have him come to her home with his two oldest sisters, although such a decision has as yet not been made. Because of his age, he has no particular feelings and ties to his parents and most recently refused to visit his mother, with whom he had monthly visits at the correctional facility in which she is housed.
 ADJUDICATION
The court finds by clear and convincing evidence that Karen G. has committed acts of omission and commission in violation of Connecticut General Statutes § 17a-112 (c)(3)(C) in that the children have been denied the care, guidance, or control necessary for the children's physical, educational, moral or emotional well being. None of the professionals treating the children doubt that the children were physically abused and traumatized by their father. While Karen, too, in some sense is a victim herself, she as an adult and responsible parent, did nothing to stop the abuse and to end it for her children. Even if, as she claims, she never engaged in any sexual abuse of the children and was not aware that her husband did so, she stood by and by doing nothing to help her children to prevent the physical abuse she admits did occur. It appears highly probably from the disclosures made by Melissa and Jennifer that she, too, engaged in the sexual abuse these children described. Nonetheless, the court cannot conclude from the evidence, that the evidence of her participation was clear and convincing. In Edward, Jr.'s case, she failed to provide him with appropriate care, proper stimulation and developmentally appropriate activities. She was unable to engage with this child and contributed to his significant developmental delays by her actions. Further, all five of her children have been adjudicated neglected. Based on the clear and convincing evidence before the court, the court finds that Karen G. has failed to achieve such a degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in the life of the children. Connecticut General Statutes § 17a-112 (c)(3) CT Page 9072 (B). The court further finds that both grounds had existed for more than one year prior to the filing of the termination petitions as to Sarah, Jennifer, Melissa and Daniel.
The petitioner has raised questions as to whether or not the grounds alleged had existed for more than one year in the case of Edward, Jr. The petitioner argues in the alternative that the grounds have existed more than one year in terms of this child's life or if the court measures from the time of his commitment to the time of the filing of the termination petition, then a waiver under all the circumstances is in the child's best interest. Connecticut General Statutes § 17a-112 (c) provides for the waiver of the one year requirement and states:
 "The court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child."
Determination of the question of a waiver is within the trial court's discretion. In re Romance M., 30 Conn. App. 839 (1993).
On April 27, 1997, Edward G., Jr. was adjudicated neglected. The termination petition was filed on January 2, 1998, approximately ten months post-neglect adjudication. The time from which to measure the passing of one year was analyzed by the Appellate Court which stated in regards to the identical, but differently numbered section of the statute:
 " . . . We do not determine the statutory year as legally requiring any fixed starting date. The statutory requirement is, simply that, at the time of the adjudication, statutory grounds exist for the termination of parental rights, and that those grounds must have existed for not less than one year. The statute does not say `one year from the date of placement' or `one year from the date of commitment'. It requires only that the ground exist for not less than one year. This is so regardless of the status of the child. The child may be in placement, in commitment or still at home, being cared for by grandparents, siblings, other relatives or strangers and may at the same time be subject to parental behavior amounting to grounds for termination of parental rights." In re Saba P., 13 Conn. App. 605, 609, 610, 538 A.2d 711
(1988).
This Court adopts DCF's second argument and concludes that the one year statutory requirement was met. In this case, concerns CT Page 9073 were raised about Edward upon his birth, in November of 1995, given the family history. His progress was actively monitored as a result. Even though no termination petition was filed until January of 1998, the grounds existed for not less than one year prior to the termination and the court so finds. A waiver is not required. Further, it certainly would be in the best interests of Edward to waive the requirement, given the totality of the circumstances in his young life. His parents, despite services, instruction and the removal of the four older children, were unable to provide appropriately for his needs as a young infant and kept him immobile in a car seat without stimulation for long periods of time. His mother was unable to rehabilitate to properly care for him.
 REQUIRED FINDINGS
No findings are made concerning the father, Edward G. due to his consent to the termination of his parental rights. The court makes the following factual findings concerning Karen G. as required by Connecticut General Statutes § 17a-112 (e):
1.) Appropriate and timely services were provided by the Department of Children and Families, including counseling, transportation assistance, visitation coordination, a parent aide, parenting classes, Birth to Three for Edward Jr. and sexual offender counseling.[4] Karen received extensive services and refused many offered. The evidence is that she did not and was not able to benefit from those services to be rehabilitated and reunited with her children and the court so finds.
2.) The court finds by clear and convincing evidence that DCF made more than reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. As previously stated, the court finds that DCF continued to pursue this goal with Karen, long after it was clear that it was not in the best interests of the children to do so.
3.) DCF, with the approval of the Court, set reasonable and realistic expectations and secured court orders in order to reunify the family. The expectations set for Karen G. were both reasonable and realistic. She was not able to meet any of them.
4.) The four oldest children have been in foster care since 1995. Sarah and Jennifer have strong emotional ties to their aunt. Jennifer wishes to be adopted by them. The oldest children have CT Page 9074 memories of their parents, continue to feel love for their mother, but know they cannot be with her. They have specialized needs and will require therapy and treatment in the years to come to assist them in dealing with the trauma inflicted by their parents. Melissa is also still exhibiting severe problems. She needs permanency in her life and a foster family who can provide the highly specialized physical, emotional and educational support the multiply traumatized child needs. She knows who her parents are and is glad that they are in a place where they cannot get at her. Daniel has made the best adjustment under the circumstances. He does not speak of his parents and is attached to his foster family. Edward, although he has visited until recently with his mother sporadically, does not speak of her and had most recently resisted visiting her. There is no close mother-child relationship evident between them.
5.) Finding regarding the age of the children. Sarah is thirteen, Jennifer ten, Melissa is seven and one-half, Daniel six and one half and Edward, Jr. two and one half years old.
6.) Finding regarding efforts of the mother to adjust her circumstances, conduct or conditions to make it in the best interests of the children to return them to her home in the foreseeable future and (a) the extent to which she has maintained contact with the children as part of an effort to reunite the children with her, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. Karen has done little to adjust her circumstances to be able to have the children returned to her. At present she is incarcerated and her future remains uncertain. She is focused on her own needs and her future and is not now able to parent any child. She has not yet addressed the issues which led to the removal of her children including her failure to protect her children. The evidence is overwhelming that she cannot and has not rehabilitated herself and it is not in these children's best interests to be returned to her home.
7.) Finding regarding the prevention of the parents from having a meaningful relationship etc. No inappropriate conduct is noted. It is the neglectful and criminal behavior of both parents which removed them from their children's lives. DCF has taken many steps to encourage the mother to have a meaningful relationship with her children and to rehabilitate herself, which she has been CT Page 9075 unable to accomplish.
 DISPOSITION
The court finds, based upon the testimony and evidence presented, that it is in the best interests of Sarah, Jennifer, Melissa, Daniel and Edward., Jr.'s best interests to terminate the parental rights of Karen G. to them. These findings are made after considering these children's highly specialized needs, the length of time they have been separated from their family of origin, their need for a secure and permanent environment, the relationship that they have with their foster parents, and the totality of circumstances surrounding their short and eventful lives. This court is aware of the "deleterious effect of prolonged temporary care of abused and neglected children." In reJuvenile Appeal (84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). The Appellate Court has also noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence. . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally,JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD 99(1979). For these four oldest children, too much time has already been taken up in waiting for the impossible to happen and they have languished in temporary placement for more than three years. The youngest child has been in foster care since 1996.
Based upon the foregoing findings, it is ORDERED that the parental rights of Edward G. and Karen G. to Sarah, Jennifer, Melissa, Daniel and Edward, Jr. are terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. A permanency plan for all the children shall be submitted within ninety days and a review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session