Memorandum of Decision
This case presents a petition for the termination of the parental rights of Karen G. and of August H. who are the unmarried biological parents of the minor children, Damian H. and Veronica H. The minor children are presently five and four years of age.
The court finds that the mother and father have appeared and have court appointed attorneys. These cases have been pending in the court system since 1994. The court has jurisdiction in this matter; there is no pending action affecting custody of the children in any other court and reasonable efforts have been made to reunite the family.
The court having read the verified petitions, the social studies, and the various documents entered into evidence, and having heard the testimony of various witnesses and evaluators, makes the following findings by clear and convincing evidence.
Respondent Father
On the first day set for trial of the case, November 17, CT Page 15471 1998, the father of the children executed a consent to terminate his parental rights. The court, after canvass of the father, found the consent to be knowingly and voluntarily made with the advice and assistance of competent counsel. The court accepted the consent. The respondent father and his attorney were excused from further participation in the proceedings.
Respondent Mother
Four years ago the Department of Children and Families ("DCF") filed a petition in the Superior Court for Juvenile Matters alleging a history of alcohol and drug abuse, and neglect, and domestic violence going back to the time of the birth of Damian in March, 1993. Around the time of the birth of Veronica on November 14, 1994, DCF became actively involved because of the issues of domestic violence, frequent referrals regarding the abusive, drunken and neglectful conduct of the children's father, the use of controlled substances by the mother (cocaine in her system at the time of the birth of Veronica), and the mother's insistence on retuning to live with the children's abusive, angry, violent and drunken father. Veronica was born with a fractured left collar bone and jaundice. Predicated upon the substance abuse by both parents, the domestic violence and the many referrals of neglectful conduct, DCF sought and obtained an Order of Temporary Custody on November 18, 1994, only four days after Veronica's birth. On December 8, 1994, four years ago, the children were committed to the Commissioner as neglected children; they have been in foster care ever since that time. There are no known relative placement alternatives.
The Social Study (Exhibit #1) indicates that the mother met the father at the age of thirteen and by age fifteen had dropped out of high school and moved in with the father. Mother admits to having three or four miscarriages due to poor nutritional intake and to substance abuse. She and father have two children by this union. Their relationship "was fraught with violence, infidelity, poor communication and alcohol and drug abuse." (Exhibit #1, p. 4.)
The only real issue in this case is whether or not the mother has successfully rehabilitated herself since the 1994 adjudication of neglect. In March, 1996 the Commissioner filed a petition to terminate the parental rights of the parents. In April, 1997 the Commissioner elected to withdraw her petition since the mother appeared to be abstinent; the Department allowed CT Page 15472 the respondent mother more time to work toward rehabilitation and reunification with the children. On January 9, 1998, DCF filed the present action for termination of the parents' rights. If anything is clear in this case it is that the respondent has been permitted an inordinate length of time to achieve parental rehabilitation. It is further clear that extensive services were offered through DCF and other agencies to aid the parents in efforts to achieve personal and parental rehabilitation. (See Exhibit #1, p. 9.)
The mother was evaluated by Dr. Robert Meier, a clinical psychologist appointed by the court. This evaluation occurred after Karen had severed her relationship with the abusive father of these children and after she had stopped the use of drugs and alcohol for what she said was more than a year. Following her clinical evaluation and testing, Dr. Meier was, at once, encouraging but very concerned.
 At times she may question whether there is something wrong with her mind, and feels a loss of control when under heavier stress. She admits to health concerns, but these are often vague, and unrelated to each other. Her daily routines show little pattern, and she avoids structuring her life and taking responsibility for her own care. She is taking care of her own basic needs, but at a minimal level and without much initiative or motivation. Many of these symptoms suggest significant problems with depression. She does not feel she has control over her feeling, and at times over her thoughts.. . . She exhibits a pattern of responding that is consistent with a predisposition to substance abuse. . . . While she may be remaining substance free at this time, her life style has not changed significantly. She continues to have trouble following through with responsibilities, and needs to address her significant emotional problems. Otherwise, she must be considered a high risk for relapse. (Exhibit #13, p. 4.)
After evaluating the mother's interaction with the children, Dr. Meier pointed out that she needed help with her parenting skills. She was unable to set limits for her children or to secure compliance with her directions. Dr. Meier's forecast for Karen was grim:
 Her resistance to treatment in the past raises serious questions at to whether she will be able to make a CT Page 15473 commitment to treatment in the future to the extent needed to address not only her parenting skills, but the emotional problems that are preventing her from being a responsible parent. (Exhibit #13, p. 7.)
The children had been in placement a year and a half when Dr. Meier evaluated the family. The children have now been in foster care for four years. At some point the equation changes. The balance between the parent's rights and the children's right to a secure and stable placement must be considered. Indeed, the statute requires the court to consider the parent's rehabilitative status as it relates to the needs and age of the particular child, and to determine whether that restoration, if possible at all, will occur within a reasonable time. General Statutes § 17-112(b)(2); In re Luis C., 210 Conn. 157, 167;In re Joshua Z., 26 Conn. 58, 64 (1991) cert. denied221 Conn. 901 (1992). What is a reasonable time is invariably a question of fact to be governed by attendant circumstances. Conte v. DwanLincoln-Mercury Inc., 172 Conn. 112, 122 (1976). The court is satisfied from the evidence that Karen has not accepted personal responsibility for her own treatment and has not endeavored to improve her parenting skills. It is unreasonable for these children to wait any longer for permanency in their lives.
Karen has lived a very transient life-style unsuitable for children. She has lived with the abusive father for three and a half years. She had her first child at age sixteen and her second child at age eighteen. She has lived in battered women's shelters and off and on with her aunt and her mother until eruptions occur and she is expelled or voluntarily leaves. She has lived with her recovering boyfriend. She has lived with her mother and her cousin. At present she lives with a female friend in one bedroom they share in the friend's family's house. She knows that in order to have her children back she must make arrangements for shelter for them. She is presently twenty-two years of age and has been unable to demonstrate any independent living.
In her own testimony she outlines her progress through the years. She denies the use of drugs since June, 1995. She has worked at an entry-level job in a grocery store that does not provide an adequate income for her own support. She has taken classes at a local educational program ostensibly to improve her earning capacity, yet she rejects working at several local Indian reservations because "they use drugs and alcohol." She admits that it is difficult for her to get up in the morning due to her CT Page 15474 depression, yet she does not take medication because she does not wish to do the therapy, according to Dr. Meier.
She hasn't taken the parenting classes because of timing and transportation issues, although she admits that DCF has offered her bus passes and varied schedules of the classes. On another referral to the Southeast Connecticut Alcohol and Drug Dependence, Inc. ("SCADD"), she was admitted for relapse prevention and counseling services on June 19, 1998. (See Exhibit #11.) The client was discharged on July 27, 1998 with the following discharge summary:
 Client's affect inappropriate, she had major defenses and was non-compliant in 1 — 1 sessions, as far as agenda assignments. She appeared to have some identity issues which were discussed but not pursued in sessions. Client was transferred into the Women's Group. She attended one session — completely alienating peers, never showed up or contacted for further sessions.
There were numerous other programs to which Karen was referred which addressed some of her problems. One program, in particular, a two year Thames River Family Program, was available to Karen to actively promote family reunification and parenting training. It provided a residence for her and day-care services for her children and an opportunity for her to work. Karen did not follow through with the application process. She told the social worker that she did not feel she could live in a structured environment. The social worker gave her the names of various programs available both in the morning and the afternoon for counseling and for parenting training. The social worker was concerned about possible depression and the need for therapy. Karen resisted these overtures.
Parents have an active, affirmative obligation to get their life in order and to develop whatever skills are necessary to reunify with their children. DCF has an affirmative obligation to make those services available. But DCF cannot compel compliance. Karen simply has not demonstrated the zeal, enthusiasm, and organization required to parent. She lacks the motivation to organize her life. She recognized herself that it would be too stressful for her to have the children back at this time.
 ADJUDICATION
CT Page 15475
This court finds by clear and convincing evidence that these children were adjudicated neglected four years ago and that the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children, such parent could assume a responsible position in the lives of the children. General Statutes § 17a-112(c)(3)(B). The father has consented to the termination of his parental rights and this consent has been accepted by the court.
This non-consensual ground has existed for more than one year.
Mandatory Findings
The court makes the following factual findings as required by General Statutes § 17a-112(e). These findings do not apply to the consenting father.
1) The timeliness, nature and extend of services offered. The court finds that parental, substance abuse, and psychiatric services were offered, visitation was offered, and specialized foster care was provided by DCF.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980. The parents had more than enough time to demonstrate their desire and concern for reunification and to achieve rehabilitation. The mother of the child was offered services she did not choose to accept. Only belatedly and tepidly did she enter counseling. It is not clear that even to this day she recognizes her need for therapy and parent training. The time period allowed for mother to achieve a suitable level of personal and parental rehabilitation was excessively generous to the mother and possibly emotionally harmful to these children.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that the mother did not fulfill or comply with the expectations, described more fully in the social study. She appeared unable to organize herself personally and was unwilling to enter therapy to resolve her multitude of personal troubles, most notably, her depression.
4) The feelings and emotional ties of the children with CT Page 15476 respect to the parents and foster parents, etc. The court finds that the children are bonded to their present foster family, they consider themselves part of the family, and that no presently existing emotional bonds will be broken by termination of the parent's rights.
5) As to the age of the children. The children are five and four years of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In re Juvenile Appeal (84-CD), 189 Conn. 276
(1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence. . . ." In re AlexanderV., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979). This issue of prolonged foster care has recently been addressed in a notice of proposed rule-making by the U.S. Department of Health and Human Services. In preparing the regulations to implement the Adoption and Safe Families Act of 1997, (Federal Register September 18, 1998), the Department indicated that "foster care is a temporary setting and not a place for children to grow up." Neither foster care nor transfer of guardianship meet all the requirements of a good permanent plan for children in most cases. In situations where the children cannot be safely returned to their parents, adoption is the best alternative when it is available.
6) The efforts the parents have made to adjust their circumstances or conditions. The court finds that the mother has been unsuccessful in making any meaningful attempt to adjust her circumstances, conduct, or condition to facilitate reunification. The father has consented to the termination of his rights.
7) The court finds that there has been nothing to prevent the parents from maintaining a meaningful relationship with the children. There was no unreasonable conduct noted by DCF. Indeed, if unreasonable conduct were to be noted it is in waiting for so many years before bringing this matter to conclusion.
 DISPOSITION
Based upon the foregoing findings, the court determines that it is in the children's best interest for a termination of parental rights to enter with respect to the mother Karen G. and the male biological parent August H. and accordingly a CT Page 15477 termination of their parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and shall file further reports as are required by state and federal law.
Francis J. Foley, Presiding Judge Child Protection Session